**Samuel ZANDS and Sara Zands, Plaintiffs,**

v.

**Paul Imon NELSON, Ellen Eliza Nelson, Mildred Tacey, Jay Goodwin, Norma Goodwin, Stephen Kramer, Cletus Kramer, Fritz A. Nachant, Inc., and Does 1 to 100, Defendants.**

Nos. 89–0989–GT, 90–1144–GT.

United States District Court, S.D. California.

June 25, 1992.

Harry V. McGahey, McGahey & McGahey, A.P.C., San Diego, Cal., for Samuel and Sara Zands.

John H. Stephens, Lynn M. Beekman, Robbins & Keehn, A.P.C., San Diego, Cal., for Paul and Ellen Nelson.

Mildred Tacey, pro se.

Peter L. Garchie, Sharon M. Lawrence, Susan E. Leonard, Lewis, D'Amato, Bris-bois & Brisgaard, San Diego, Cal., for Jay and Norma Goodwin.

Carl J. Klunder, Karen A. Gruber, James P. Carter, Ramsay, Johnson & Klunder, Irvine, Cal., for Fritz Nachant.

## MEMORANDUM OPINION AND ORDER

GORDON THOMPSON, Jr., District Judge.

On April 27, 1992 at 10:30 a.m., the above-captioned case came on for hearing. The plaintiffs had filed a motion for summary judgment against all the defendants, and defendants Goodwins and Nelsons had filed motions for summary judgment. The Court has fully considered this matter, including review of all papers and documents submitted by the parties in support of and in opposition to the respective motions.

### I

### . CONSOLIDATION

Case numbers 89–0989–GT (CM) and 90–1144–GT (CM) are hereby consolidated.

### II

### PROCEDURAL BACKGROUND

On December 3, 1991, this Court ruled on previously filed motions for summary judgment. *See Zands v. Nelson,* 779 F.Supp. 1254 (S.D.Cal.1991). The December opinion held that RCRA did not contain a petroleum exclusion and that the creation of solid waste sufficiently supported a RCRA claim. Additionally, the Court, addressing the issue of contribution, held: "None of these individuals are so far removed that it can be said as a matter of law they did not contribute to the leakage." *Id.* at 1264. Because discovery was not complete, however, the Court postponed the resolution of the contribution issue until this factual summary judgment hearing.

### III

### FACTUAL BACKGROUND

The pertinent facts of ownership of the land and use of the gas tanks are the same

as those facts set forth in the December Order. Defendants PAUL and ELLEN NELSON owned all title to the property in question from 1961 to November 1976. In 1972, the NELSONS instructed defendant FRITZ NACHANT CO. to install the piping and pumps for gasoline tanks at a service station on this property. The NELSONS then operated the gas station until 1975. In 1975, the NELSONS leased the gas station to defendants STEPHEN and CLETUS KRAMER. Although the KRAMERS maintained their lease and operated the gasoline station pumps from May 1975 to March 1979, the property was transferred to defendant MILDRED TACEY, who owned the property from November 1976 to April 1978, and then to defendants JAY and NORMA GOODWIN, who owned the property from April 1978 to December 11, 1980. In December of 1980, the GOODWINS transferred the property to the plaintiffs, SAMUEL and SARA ZANDS. It is unclear from the evidence if the gas station was ever operated after the KRAMERS' lease expired in 1979.

----

#### OWNERS

|  | Paul and Ellen Nelsons |
| 1976 | ↓ |
|  | Mildred Tacey |
| 1978 | ↓ |
|  | Jay and Norma Goodwin |
| 1980 | ↓ |
|  | Samuel and Sara Zands |

#### OPERATORS

|  | Paul and Ellen Nelsons |
| 1975 | ↓ |
|  | Stephen and Cletus Kramer |
| 1979 | ↓ |
|  | ??? |

----

In 1987, the Bostonia Fire Department informed the plaintiffs the underground gasoline tanks had to be removed because the tanks violated the Uniform Fire Code. The plaintiffs removed the tanks in October 1987. At that time, they had the property tested for soil or groundwater contamination, and learned that hydrocarbon contamination had occurred.

It is undisputed that there has been leakage of gasoline into the soil at the property in question. The plaintiffs' expert, Stan L. Reynolds, stated that he believed 30,000 to 40,000 gallons of contamination occurred; defendant Nelsons' consultant, Mr. Zipp, believed that only 3,000 to 10,000 gallons of contamination occurred; and no defendant has submitted any evidence that there was no contamination. Although the plaintiffs claim there was no gasoline in the tanks at any time after the plaintiffs purchased the land, two witnesses state that they saw a co-owner of the plaintiffs, Mr. Israel Zamds, place the gasoline hose into his car on one occasion. Defendant Goodwin declares the gasoline pumps and tanks on the property had been abandoned and were no longer in use at the time he sold the property to the plaintiffs.

### IV

### CONCLUSIONS OF LAW

#### A. SUMMARY JUDGMENT

Rule 56(c) of the Federal Rules of Civil Procedure provides:

> The [summary] judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no *genuine* issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

F.R.C.P. 56(c) (1987) (emphasis added). At the summary judgment stage of the proceedings, the evidence must be viewed in the light most favorable to the non-moving party and all justifiable inferences are to be drawn in the non-movant's favor. *Anderson v. Liberty Lobby*, 477 U.S. 242, 255, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986).

When, as is the case here, the moving party is a plaintiff, he or she must adduce admissible evidence on all matters as to which he or she bears the burden of proof. Schwarzer, Tashima, & Wagstaffe, *Federal Civil Practice Before Trial* 14:140 (1992). As a result, the Court will evaluate the elements of a section 6972(a)(1)(B) claim as to each defendant to determine whether there is genuine issue of material fact as to any element of plaintiffs' claim for relief.

## B. THE RCRA CLAIM AGAINST THE OWNER/OPERATOR DEFENDANTS

The Court will first review plaintiffs claim against all of the defendants except defendant Nachant. These defendants, who will be referred to as the owner/operator defendants, all owned the land in question and/or operated the gas pumps on the land in question. These defendants are similarly situated and subject to the same legal review.

■ Section 6972(a)(1)(B) provides in part that "... any person may commence a civil action on his own behalf ... against any person ... who has contributed ... to the past ... handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment...." 42 U.S.C. § 6972(a)(1)(B) (1983 & Supp.1991).

The December 3, 1991 Order resolved the question of whether an action could be maintained for the creation of solid waste. *Zands v. Nelson*, 779 F.Supp. 1254, 1263–64 (S.D.Cal.1991). The Court now finds there has been a creation of solid waste. Additionally, each of these defendants qualifies as a "person" as required under the statute. Despite the argument to the contrary, it is not necessary that the plaintiffs prove that the property is a storage facility. Although the language of section 6972 states "any person ... including any ... past owner or operator of a ... storage ... or disposal facility," the use of the word "including" does not limit the definition of the word "person," and the Court will not construe it in such a restricted manner.

The two remaining elements that a plaintiff must show to prevail in a RCRA claim are that there is an imminent hazard and that defendants contributed to the hazard.

### 1. *An Imminent Hazard*

■ To prevail in a section 6972(a)(1)(B) claim, a plaintiff must show that the solid or hazardous waste may present an imminent and substantial endangerment to health or the environment. In *United States v. Ottati & Goss, Inc.*, 630 F.Supp. 1361 (D.N.H.1985), the district court defined imminent hazard:

> An "imminent hazard" may be declared at any point in a chain of events which may ultimately result in harm to the public. It is not necessary that the final anticipated injury actually have occurred prior to a determination that an "imminent hazard" exists.

*Id.* at 1394 (*quoting Environmental Defense Fund v. E.P.A.*, 465 F.2d 528, 535 (D.C.Cir.1972) (*quoting* EPA Statement of Reasons Underlying the Registration Decisions, March 18, 1971)). The Court holds, based on the evidence before it, that there is an imminent and substantial endangerment to health or the environment as a result of the contamination at issue in this case.

### 2. *Contribution*

The final element a plaintiff must prove to prevail in a section 6972(a)(1)(B) claim is that defendants "contributed to" the contamination. The Court holds that a genuine issue of fact does exist on the issue of contribution with respect to the owner/operator defendants. As a result, summary judgment is not appropriate. The following analysis is intended both to explain this conclusion, and to guide the parties as to how the legal issues relating to this element of the plaintiffs' case will be resolved when the case proceeds to trial.

### a. *Overview of Contribution*

■ Individuals are liable under RCRA without regard to fault or negligence. *See United States v. Ottati & Goss, Inc.*, 630 F.Supp. 1361, 1400–01 (D.N.H.1985), *affirmed,* 900 F.2d 429 (1st Cir.1990) (*quoting United States v. Hardage*, 18 E.R.C. 1685, 1686 (W.D.Ok.1982) ("It would be improper to read a negligence standard into the statute, not only because of the plain language of the statute but because of the hazardous nature of the activity.")). The "contributed to" language, however, has been held to "expressly specif[y] that there is no liability without a causal relationship between a defendant and an imminent and substantial endangerment." *See United States v. Hardage,* 116

F.R.D. 460, 466 (W.D.Ok.1987); *United States v. Bliss*, 667 F.Supp. 1298, 1313 (E.D.Miss.1987). As a result, the Court must find a nexus between the defendant and the solid waste.

In *United States v. Price*, 523 F.Supp. 1055 (D.N.J.1981), the court discussed the legislative history of RCRA as it relates to contribution:

> This legislative history reveals two noteworthy points: first, that Congress intended the phrase 'contributing to' disposal to be interpreted in a liberal, not a restrictive, fashion; and second, that Congress realized that past acts could presently be contributing to an endangerment and intended those acts to be within the ambit of the statute.

*Id.* at 1073 (*citing* S.Rep. No. 172, 96th Cong., 2d Sess. 5, *reprinted in* [1980] U.S.Code Cong. & Ad.News 5019, 5023). *See also United States v. Ottati & Goss, Inc.*, 630 F.Supp. 1361, 1393 (D.N.H.1985). Similarly, the Court will construe "contributed to" in a liberal fashion.

*b.  Owners Or Operators Contribute to All Contamination that Occurs to Property, Regardless of the Cause; The Contamination Was Not Caused By Gasoline From Any Other Tanks*

■ Using this liberal interpretation of contribution, the Court holds that owners and operators contribute to the contamination if the contamination is the direct result of activities related to the operation of a gas station; plaintiffs need not prove the specific cause of the contamination. Clearly, individuals who own or operate gas stations are responsible for gasoline that leaks from the piping system or the gas tanks themselves. Indeed, the direct relationship between the leakage and the equipment owned and operated for use at the gas station is sufficient to prove the element of "contribution." Additionally, however, owners and operators are responsible for more tangential accidents not directly tied to the gas station's equipment. This would include, but is not limited to, spillage caused by individuals or companies filling the gas tanks for the owners and operators. Despite the potentially broad

scope of liability caused by this interpretation of the statute, this interpretation is consistent with the purposes of a statute that imposes strict liability. Indeed, this interpretation does no more than hold defendants responsible for gasoline that would not have been brought onto the property but for the presence of a gas station. Moreover, as individuals who own and operate gas stations benefit financially from their gas stations, they should be held responsible and accountable for injury to the environment that would not have happened without the presence of their gasoline-related activities.

The owner/operator defendants have hypothesized several alternatives for how the gasoline leaked into the soil. None of these alternatives, however, presents an explanation that would justify finding that the owners and operators of this gas station did not contribute to the contamination of the property. Indeed, the primary acceptable and plausible explanation envisioned by the Court—that the gasoline leaked from another gas station or that the leakage came from other gas tanks in the neighboring vicinity—is refuted by the uncontradicted evidence which repeatedly states that there were no other gas tanks in the vicinity. Indeed, defendant Paul Nelson stated: "That property was virgin property in there. It was about a 10 foot cut through that area. And those 2 tanks were the only ones, to my knowledge, other than some stuff over to the east, maybe years ago." Similarly, when defendant Fritz Nachant was asked if he was aware of any other underground storage tanks within 500 yards of the property, he responded: "No." As a result, the Court holds that based on the evidence presented in support of these motions, the contamination was caused by gasoline that came from the ownership and operation of this gas station.

*c.  Plaintiffs Must Prove Some Contamination Occurred Prior to the Transfer of the Property to Plaintiffs*

■ Of course, plaintiffs cannot prevail if they prove only that the defendants were

the owners and operators of this gas station at some point in the past. Additionally, to hold these defendants responsible for the contamination, it is necessary to prove that the defendants were the owners and operators of the gas station *when* the gasoline leaked into the soil. The primary issue thus becomes: "When did the contamination occur?" Although the court will return to the question of specifically what plaintiffs must prove to prevail on their RCRA claim, it is clear that plaintiffs cannot be the cause of the contamination.

In the same manner that the owner/operator defendants are strictly liable for contamination caused by leakage related to activities of this gas station, plaintiffs are strictly liable for leakage that occurred after plaintiffs acquired the property. As a result, plaintiffs may only hold defendants liable for *that portion* of the contamination that occurred prior to the transfer of the property to plaintiffs.

Moreover, as will be developed more fully below, the plaintiffs will have to prove that at least some of the contamination occurred prior to the transfer of property to the plaintiffs. It is clear from the evidence that the plaintiffs cannot prove by direct evidence that the contamination occurred during the defendants' collective ownership and operation of this gas station. As a result, the plaintiffs will have to use circumstantial evidence to prove when the contamination occurred, asking the fact-finder to infer that the contamination took place prior to 1980 from the fact that it did not occur after 1980. If the plaintiffs cannot make this most basic showing, then the plaintiffs cannot prove that plaintiffs were not the sole cause of the contamination. As a result, the trial will occur in two stages. The first stage of the trial will determine whether any of the leakage occurred prior to the time when the property was transferred to the plaintiffs. The sec-

ond stage of the trial will provide each of the owner/operator defendants with the opportunity to shift liability to the remaining defendants.

*d. Plaintiffs Must Prove That the Contamination Occurred While Defendants as a Group Owned or Operated the Gasoline Station; If Plaintiffs Prove That The Contamination Was Present Prior to the Transfer of the Property to Plaintiffs, Each Defendant Must Individually Prove that No Contamination Occurred While That Defendant Owned or Operated the Property*

Even if the plaintiffs prove that the contamination occurred prior to the transfer of the property to the plaintiffs, however, it will still not be known "When the contamination occurred." [1] In resolving this question, the consecutive ownership of the property and operation of the gas station by the defendants raises a significant issue of evidentiary burdens—whether the plaintiffs must show (1) that specific amounts of contamination occurred while each defendant owned or operated the property or (2) that the contamination occurred during defendants' collective ownership and operation of the property. Importantly, the second alternative results in a shifting of the burden of proof from the plaintiffs to the defendants.

The defendants argue that the first alternative is the appropriate standard. They contend that the plaintiffs should not prevail, even if the plaintiffs can prove that some or even all of the contamination occurred prior to the transfer of the property to the plaintiffs, unless the plaintiffs prove that contamination occurred during a specific defendant's ownership or operation. Specifically, the defendants rely on language in *United States v. Conservation Chemical Co.,* 619 F.Supp. 162 (D.C.Mo.

---

**1.** The arguments contained in this section assume that the plaintiffs do in fact prove the contamination occurred prior to the transfer of property to the plaintiffs. This assumption is not intended to suggest that the plaintiffs have made this showing, or that the plaintiffs will be able to make this showing. Instead, this assumption, and comments that contain this assumption, are made by the Court for the purpose of explaining to the parties the legal rules that will govern the second stage of trial in the event the plaintiffs do prevail at the first stage of trial.

1985), which requires proof that "a particular generator's waste ... 'has contributed or is contributing' to a situation which may present an imminent and substantial endangerment to health or the environment." *Id.* at 199. In essence, the defendants argue that the plaintiffs' inability to pinpoint the contamination to a specific time period should free the owner/operator defendants of liability. For the reasons set out in the following pages, the Court does not agree.

RCRA noticeably has not addressed the issue of the burden of proof in a complicated case such as this one, involving several potential tortfeasors. Because the judicial development of federal common law is appropriate to fill in the gaps of a federal statute,[2] the Court must develop federal common law to resolve this unaddressed issue.

Several possible alternatives have been developed to deal with the problem of several possible tortfeasors. *See Smith v. Cutter Biological, Inc.,* 911 F.2d 374, 376 (9th Cir.1990) (referring to three types of approaches that have been adopted in various jurisdictions). First, alternative liability—where several defendants act tortiously and it is not possible to determine which defendant caused plaintiff's injury, the burden shifts to the defendants to prove they did not cause the injury. *See, e.g., Summers v. Tice,* 33 Cal.2d 80, 199 P.2d 1 (1948). Second, enterprise liability—if a plaintiff can prove that an entire industry was tortious, the burden shifts to the members of that industry to prove they did not supply the specific product that caused the injury. *See, e.g., Hall v. E.I. Du Pont,* 345 F.Supp. 353 (E.D.N.Y.1972). Third, market share liability—where it is impossible for the plaintiff to prove which member of the market was responsible for the injury, each member of the market is responsible for a percentage of the recovery matching its share of the market. *See, e.g., Sindell v.*

*Abbott Lab.,* 26 Cal.3d 588, 163 Cal.Rptr. 132, 607 P.2d 924, *cert. denied, E.R. Squibb & Sons, Inc. v. Sindell,* 449 U.S. 912, 101 S.Ct. 285, 66 L.Ed.2d 140 (1980).

Despite the numerous opinions written on the issue of multiple possible tortfeasors, neither plaintiffs nor defendants cite a case that involves the factual setting of this case—specifically, consecutive ownership and consecutive operation. Likewise, the Court's independent research has not produced such a case. Although there has been a fair amount of debate about the enterprise liability and market share liability theories, the Court is unaware of any jurisdiction that has rejected alternative liability when all requirements are met. *See, e.g., In re Agent Orange Product Litigation,* 597 F.Supp. 740, 826 (E.D.N.Y.1984) (Weinstein, J.) ("None of the courts [considering the theory have] rejected alternative liability when all the defendants were before the court."). Those jurisdictions that have not adopted alternative liability simply have not addressed the question of whether plaintiffs must prove individual causation despite the problems posed by multiple possible tortfeasors. *See, e.g., Smith v. Cutter Biological, Inc.,* 911 F.2d 374, 376 (9th Cir.1990) ("Hawaii Supreme Court has neither adopted nor rejected any of these theories."); *Lee v. Baxter Healthcare Corp.,* 721 F.Supp. 89, 94 (D.Md.1989) ("Alternative liability has not been adopted by any Maryland appellate court"). The Court thus draws upon these theories, the reasons behind them, and the legislative history of RCRA to develop federal common law.

#### (i) ALTERNATIVE LIABILITY

The birth of alternative liability is generally traced to the seminal case of *Summers v. Tice,* 33 Cal.2d 80, 199 P.2d 1 (1948). In *Summers,* plaintiff was injured when his two hunting companions negligently fired their guns toward him. Only one of the

---

**2.** *See United States v. Little Lake Misere Land Co.,* 412 U.S. 580, 593, 93 S.Ct. 2389, 2397, 37 L.Ed.2d 187 (1973). *See also United States v. A & F Materials Co., Inc.,* 578 F.Supp. 1249, 1255 (S.D.Ill.1984) (developing federal common law for CERCLA and RCRA); *United States v. Chem–Dyne Corp.,* 572 F.Supp. 802, 808, 810

(S.D.Ohio 1983) (examining Restatement as part of the common law for CERCLA because "the inevitable incompleteness presented by all legislation means that the interstitial federal lawmaking is a basic responsibility of the federal courts.")

bullets struck plaintiff, but it was not possible to ascertain which defendant fired the shot that hit him. The California Supreme Court held that both defendants had been negligent and shifted the burden to the defendants to prove they had not injured plaintiff. The court recognized that in fact one of the defendants was "innocent"—i.e., had not injured plaintiff. The court, however, reasoned that where more than one defendant is a culpable risk creator, each defendant should have to exonerate himself, because otherwise an innocent plaintiff will have to bear the cost of the defendants' negligence.

More recently, the Michigan Supreme Court defined the test for alternative liability in *Abel v. Eli Lilly & Co.*, 418 Mich. 311, 343 N.W.2d 164 (1984). In *Abel*, the court stated the criteria for applying alternative liability: (1) all defendants must have acted tortiously, (2) plaintiff must have been harmed by the conduct of at least one of the defendants, and therefore plaintiff must bring all possible defendants before the court; and (3) plaintiff must be unable to identify which defendant caused the injury. *Id.* at 331–32, 343 N.W.2d 164. The third factor is somewhat superfluous because a plaintiff need not proceed on a theory of alternative liability in any event if the plaintiff can identify which defendant caused the injury. As a result, the primary two factors for alternative liability are tortious conduct and the presence of all defendants.

### (a) Tortious Conduct

The Restatement (Second) of Torts eventually "codified" the *Summers* holding. Section 433B(3) of the Restatement recites the rule as follows:

> When the conduct of two or more actors is tortious, and it is proved that harm has been caused to the plaintiff by only one of them, but there is uncertainty as to which one caused it, the burden is upon each such actor to prove that he has not caused the harm.

The policy behind this modification of the causation requirement is the "injustice of permitting proved wrongdoers, who among them have inflicted an injury upon the entirely innocent plaintiff, to escape liability merely because the nature of their conduct and the resulting harm has made it difficult or impossible to prove which of them has caused the harm." Restatement (Second) of Torts, § 433(B), comment f. This exception to the general rule arises "where the conduct of two or more actors has been proved to be negligent or *otherwise tortious*, and it is also proved that the harm to the plaintiff has been caused by the conduct of only one of them, but there is uncertainty as to which one." Restatement (Second) of Torts, § 433(B), comment f (emphasis added). The rule, however, has no application where "there is no proof that the conduct of more than one actor has been tortious at all." Restatement (Second) of Torts, § 433(B), comment g.

### (b) Plaintiffs Must Join All Potential Defendants

The second requirement a plaintiff must show to prevail in an alternative liability claim is that the plaintiff has joined all potential tortfeasors. Although courts have relaxed this factor in some circumstances, *see, e.g., Hall v. E.I. Du Pont*, 345 F.Supp. 353, 379 (E.D.N.Y.1972), the joinder of all potential tortfeasors guarantees the presence of the responsible party. Indeed, courts most frequently cite this factor as the reason for not allowing plaintiffs to proceed on alternative liability theories. *See, e.g., Long v. Krueger, Inc.*, 686 F.Supp. 514, 517–19 (E.D.Pa.1988) (granting defendants' motion for summary judgment where plaintiff failed to name as defendants all those who could have caused the injury); *Marshall v. Celotex Corp.*, 651 F.Supp. 389, 392 (E.D.Mich.1987) (same); *Vigiolto v. Johns–Manville Corp.*, 643 F.Supp. 1454, 1457 (W.D.Pa.1986), *aff'd*, 826 F.2d 1058 (3d Cir.1987) (same); *Mulcahy v. Eli Lilly & Co.*, 386 N.W.2d 67, 73 (Iowa 1986) (same); *In re Agent Orange Product Litigation*, 597 F.Supp. 740, 826 (E.D.N.Y.1984) (Weinstein, J.).

### (ii) ENTERPRISE LIABILITY AND MARKET SHARE LIABILITY

Neither enterprise liability as discussed in *Hall v. E.I. DuPont De Nemours & Co.*, 345 F.Supp. 353 (E.D.N.Y.1972) (Weinstein,

J.), nor market share liability as discussed in *Sindell v. Abbott Lab.*, 26 Cal.3d 588, 163 Cal.Rptr. 132, 607 P.2d 924 (1980), apply to the present factual situation in a technical sense. Both of these theories of liability refer to the tortious conduct of an industry. Clearly, the owner/operator defendants do not represent an industry; they were consecutive owners as opposed to simultaneous competing owners.

### (iii) THE FEDERAL COMMON LAW: CONSECUTIVE OWNER AND CONSECUTIVE OPERATOR LIABILITY

#### (a) Vertical Enterprise: A Starting Premise for Consecutive Owner and Consecutive Operator Liability

Although the theories of enterprise liability and market share liability are technically inapplicable, the defendants do comprise a different type of enterprise. Whereas the defendants in *Hall* represent what might be labelled a "horizontal enterprise," the owner/operator defendants' activities should be labelled a "vertical enterprise" over time. This vertical enterprise derives from the fact that the owner/operator defendants consecutively owned and operated the gas station.[3] Similar to the industry situation where it is unknown, and unknowable, which member of the industry specifically caused the injury, it is likewise unknown, and unknowable, which defendant or defendants owned the property when the contamination occurred. Although not purposefully, the owner defendants created the difficulties of proof when they transferred the property from defendant to defendant. Similarly, the operator defendants created the difficulties of proof when they switched operators. Had only one defendant owned the property or operated the gas station, the plaintiffs could prevail by showing that some contamination occurred prior to the transfer of the property to plaintiffs. By analogy, the enterprise and market share liability theories

refuse to allow members of an industry, engaged in similar activity, to avoid liability. By engaging in similar activity, it is as if there only were one member in the market. Notably, had there only been one member in the industry, that member would be liable because the evidentiary problem of causation would not exist. Here, each of the owner/operator defendants engaged in the same strict liability activities (ownership and operation) and the mere engagement in these activities leads to liability if causation is proven. These facts support shifting the burden of proof on causation to the members of the vertical enterprises.

#### (b) Tortious Conduct and Strict Liability

Although most of the cases discussing alternative liability have involved negligence causes of action, the present case is one in strict liability. *But see Chelton v. Keystone Oilfield Supply Co.*, 777 F.Supp. 1252, 1256–58 (W.D.Pa.1991) (applying alternative liability to a strict liability case under Pennsylvania law after comparing *Cummins v. Firestone Tire & Rubber Co.*, 344 Pa.Super. 9, 495 A.2d 963 (1985), where the court declined to apply alternate liability to a strict liability claim with *Erlich v. Abbott Laboratories*, 5 Phila. 249 (1981), where a trial court held that alternative liability applied to a "DES" (diethylstilbestrol) strict product liability case). The significant issue not addressed by the Restatement and the cases applying the theory of alternative liability is: "What constitutes tortious activity?" Notably, the language of comment f does not limit alternative liability to negligence cases. The language indicates the doctrine applies to "negligent *or otherwise tortious*" conduct. In the negligence case, tortious conduct is the negligent act—the breach of a duty. Once a plaintiff proves a negligent act, the plaintiff can then recover on a theory of negligence by showing causation

---

**3.** Carefully broken down, two separate vertical enterprises exist in this case that could give rise to liability. The first rests in the owner defendants' consecutive ownership of the property, and follows the chain of title from the NELSONS to TACEY to the GOODWINS. The second rests in the operator defendants' consecutive operation of the property, and follows the chain from the NELSONS to the KRAMERS and then possibly to the GOODWINS. The plaintiffs have chosen to proceed against both of these vertical enterprises simultaneously, but could have proceeded against either one alone.

and damages. In the strict liability case, on the other hand, there is simply the act itself—engaging in the strict liability activity. Once the defendant has engaged in the act, plaintiffs will prevail in tort if harm results. The Court thus turns to the issue of defining a tortious act in a strict liability case.

On the one hand, a strict liability act gives rise to liability in tort when harm follows. It thus could be argued that the act giving rise to strict liability is not a tortious act until after it causes harm. Using such an interpretation, the plaintiffs cannot utilize alternative liability because the plaintiffs have proven only that each of the defendants owned or operated a gas station (engaged in a strict liability activity). Having failed to prove that the activity caused the contamination, plaintiffs' proof would not amount to tortious conduct under this interpretation. However, if the plaintiffs had made or could make that additional showing of causation, the plaintiffs would have no need for alternative liability—they would have already proved causation, as well as the act. The irony of such a rule is that strict liability plaintiffs could never use alternative liability because it would always be necessary to prove causation before the act could be labelled tortious. This rule thus places the strict liability plaintiff in a worse position than the negligence plaintiff because alternative liability is an unavailable legal theory.

On the other hand, it could be argued that merely engaging in the strict liability activity is the tortious act. Indeed, this interpretation recognizes that it is awkward to alter the characterization of an act depending upon later events. The act itself gives rise to liability in tort, and actually is the equivalent of the breach of duty described as a negligent act in a negligence case. Negligent acts only result in liability when plaintiffs prove causation

and damages; strict liability acts only result in liability when plaintiffs prove causation and damages. Defining both such acts as tortious acts, even though both such acts may not ultimately result in liability in tort, recognizes no more than the basic legal conclusion that such acts may give rise to an action in tort if causation is proven. Consequently, in the strict liability case, the tortious conduct is the act itself, an act that results in liability if harm follows. In a RCRA case such as this one, the tortious conduct is the ownership of property and the operation of a gas station on this property. No liability arises unless the gas station's presence causes contamination, but the owner/operator defendants' connection to the gas station's presence is a tortious act. Courts shift the burden of proof on the issue of causation in the negligence case; courts likewise should shift the burden in a strict liability case, such as this one.[4]

Several policy arguments provide additional support for shifting the burden of proof in the strict liability contamination case involving consecutive owners and operators:

First, and most importantly, it is not unreasonable to require a person who has engaged in a strict liability activity not only (1) to be liable for all damages that flow from the activity, but (2) to show that his engagement in the activity did not produce any harm. The basis of the strict liability tort rests in the keeping of a thing known to be dangerous. In this case, the dangerous product is gasoline. Engaging in such a strict liability activity carries with it certain risks and, justifiably, additional responsibilities. As a result, it is appropriate to require the owners/operators defendants, having chosen to engage in and profit from the gasoline-related activities that caused the contamination, to prove the con-

4. The Court notes that this ruling only addresses RCRA contamination cases involving consecutive owners and consecutive operators. The Court does not intend to suggest that alternative liability, or some derivative thereof, applies to every strict liability case. Different lawsuits have different characteristics and the policies

guiding the decision in the present case may not be present in other strict liability cases. *Cf. Kinnett v. Mass. Gas & Elec. Supply Co.,* 716 F.Supp. 695, 700 (D.N.H.1989) (not applying alternative liability in negligence case because plaintiff failed to allege products were generic or fungible).

tamination did not specifically occur while they owned or operated the gas station.

Second, the person who has engaged in a strict liability activity is a culpable risk creator. Such a broad application of the rule initially appears troubling. The rule in *Summers* and the subsequent cases shifts the burden from the innocent plaintiff to two or more negligent defendants. Here, each owner/operator defendant did no more than own the land or operate the gas station, and if in fact the contamination occurred after the defendant's ownership or operation, the ownership or operation did not cause the contamination. Concededly, the owner/operator defendant does not carry the burden of the negative label, "negligent actor." The owner/operator defendant, however, is no less a "culpable risk creator" than the negligent actor. Indeed, to refuse to acknowledge this basic fact is to ignore the decision Congress made when it created a strict liability rather than a negligence statute. Specifically, the fault principle of negligence theory has no relevance to a RCRA claim.

Third, the failure to utilize alternative liability will make it impossible for plaintiffs to prevail in this case (and other consecutive owner and operator cases like it); fourth, even though it will be impossible for the plaintiffs to prevail without alternative liability, at least one, if not more, of the owner/operator defendants is the responsible tortfeasor. The potential impossibility of this claim does not itself justify shifting the burden. When connected with the Congressional desire to implement clean-up of contamination as quickly and efficiently as possible, however, the impossibility of claims warrants additional mea-sures to insure that responsibilities for clean-up are shared by several, rather than few, owners and operators. Indeed, the refusal to shift the burden and distribute responsibility for clean-up would directly contravene the current policy of implementation of the statute, which prefers sharing the costs of contamination clean-up. Indeed, Congress expressed its views on the significance of compensation when it made RCRA a strict liability statute. This objective, and thus substantive justice, will be regularly subverted and undermined if the burden of proof is not shifted to defendants in consecutive ownership cases such as this one.[5] Moreover, because of the impossibility of these types of claims, refusing to shift the burden of proof would free owner/operator defendants of liability even if a plaintiff proves all of the contamination was present prior to the transfer of the property to the plaintiff. Such a result is illogical. Under such a rule, a plaintiff can prove that one or more defendants is fully responsible and yet the plaintiff is denied any recovery simply because the property changed hands on several occasions. Consequently, equity requires a shifting of the burden. Such a shifting of the burden of proof removes the possibility that plaintiffs will be without a remedy *even though the Court knows that the contributor is before it.*

Fifth, the strict liability plaintiff should not be in a worse position than the negligence plaintiff. Defendants' construction would effectively eliminate alternative liability from all strict liability cases, thus depriving strict liability plaintiffs of a legal tool recognized and utilized in tort law

---

5. Albeit in the discussion of negligence cases, Harper, James & Gray elaborate further on the "sterile and rigid" procedure that would turn the innocent victim away while exonerating tortious actors. *See* Harper, James & Gray, 4 *The Law On Torts* § 20.2 at 101–04 (1986).

It should never be forgotten that procedure should be the handmaiden, not the mistress, of justice. This does not mean, of course, that the fundamental guarantees of procedural due process are not vitally important. They are. But an observance of them will always mean that rights and liabilities under the substantive law will in some cases be unenforcea-ble. And that is a *cost, not an advantage,* of these guarantees. Whenever a procedural rule will consistently work to subvert substantive justice, it should be scrutinized to see whether any fundamental guarantee requires the rule to persist in such a form. Here clearly it does not. Even granting sacredness to the fault principle, there are many instances where procedural burdens have been shifted by statute or judicial ruling on the basis of considerations like those present here. *Res ipsa loquitur* and the presumption against bailees furnish ready examples.

*Id.* at 103 n. 26.

since *Summers.* Indeed, the only policy justification for not applying alternative liability to a strict liability case is that strict liability is harsh enough already. This "harshness" does not justify depriving plaintiffs of a genuinely needed evidentiary tool.

Sixth, the owner/operator defendants had the best opportunity to gather evidence that would have proven when the contamination occurred. Each defendant could have tested the soil at the end of his or her ownership and operation of the property. Such a test would potentially have proven the absence of contamination when a given defendant separated from the property, thereby enabling that defendant to prove he or she did not cause the contamination. The plaintiffs, on the other hand, did not have this option. At best, the plaintiffs could have tested the property at the time they purchased it. Had the plaintiffs conducted such a test and found contamination, they would have had direct evidence to use at the first stage of the trial. The plaintiffs, however, would still have no evidence as to when the contamination occurred. In a related argument, the plaintiffs' presence on the property when the contamination was found, years after the transfer of the property, does not give the plaintiffs greater access to evidence regarding when the contamination occurred. The existence of greater knowledge simply has not been shown. Even accepting defendants' argument that defendants did not get to inspect the piping and the tanks, defendants have not shown how the addition of this evidence would assist in the determination of *when* the contamination occurred. Concededly, the inspection of the piping system and the tanks might be relevant to the question of how the contamination occurred. But *how* the contamination occurred is irrelevant. These defendants are the past owners and operators of the gas station, and thus these defendants are responsible for the leakage regardless of how it occurred. As a result, the owner/operator defendants are certainly in no worse a situation with respect to evidence than the plaintiffs.

### (c) Burden Shifting

If the plaintiffs prove the presence of contamination prior to the transfer of the property to the plaintiffs, the plaintiffs will have proven: (1) that the plaintiffs did not cause the contamination and (2) their *prima facie* case. If plaintiffs prove their *prima facie* case, the Court will proceed to the second stage of the trial where each of the owner/operator defendants will be required to do exactly what plaintiffs were required to do: to prove gasoline did not contaminate the land while each of them individually either owned or operated the property. In essence, the burden of proof will be shifted to the defendants to apportion damages between themselves. *See, e.g., McElhaney v. Eli Lilly & Co.,* 564 F.Supp. 265, 269 (D.S.D.1983) (removing from plaintiff the burden of identifying the source of the DES which allegedly injured her, and shifting to each defendant the burden of proving it was not the source of the DES to which plaintiff was exposed). Defendants cannot, however, shift liability back to plaintiffs. If it is concluded that the plaintiffs did not cause of the contamination, the defendants as a group must be the cause. As a result, the Court will require each owner/operator defendant to prove no contamination occurred during his or her period of ownership or operation in order to shift liability to the other owner/operator defendants.

### (d) The Rule

For the reasons set forth above, the Court will apply the following rule in this case:

* Where plaintiff identifies a period of time during which contamination occurred,

* where owners of the property or operators of a gas station are strictly liable for the contamination of the property that occurred during their period of ownership or operation,

* where plaintiff joins as defendants all persons who owned the property or operated the gas station for at least a portion of the time during which the contamination occurred,

\* but where plaintiff cannot prove which owner or operator "caused" the contamination because more than one person owned the property and operated the gas station during the period of known contamination,

\*\* the Court will shift the burden to each of the owner/operator defendants to show the contamination did not occur during the period of the defendant's ownership or operation.

By proving the gas tanks were installed in 1972 and joining all subsequent owners and operators as defendants in this action, the plaintiffs have taken the necessary step of proving the owner/operator defendants collectively contributed to the contamination (assuming the plaintiffs prove the contamination occurred prior to 1980). Restated, having joined all owners and operators as defendants, any contamination present on the land prior to the plaintiffs' arrival is contamination for which all defendants, at least initially, will be held liable.

*e. Application of the Evidence: There Is A Genuine Issue of Fact As To Whether There Was Contamination Prior to the Transfer of the Property to Plaintiffs*

■ As the previous analysis indicates, the first stage of the trial will require proof that the contamination occurred prior to the transfer of the property to plaintiffs. The Court thus turns to this stage for purposes of this summary judgment motion. The key undisputed facts are: (1) from 1972 to 1980, the Goodwins, Ms. Tacey, the Nelsons, and the Kramers owned the property in question and operated the gasoline tanks located on the property; (2) in 1980, the property was transferred to plaintiffs. The relevant disputed facts are: (1) the amount of contamination; and (2) whether there was gasoline in the tanks after 1980. As to the first disputed fact, plaintiffs adduce evidence that there is between 30,000 and 40,000 gallons of contamination. Defendants, on the other hand, state there is only between 3,000 and 10,000 gallons of contamination. As to the second disputed fact, plaintiffs declare they never used the pumps and the tanks contained no gasoline at any time after plaintiffs purchased the property in December 1980. Defendant Goodwin even declares the gasoline pumps and tanks on the property had been abandoned and were no longer in use when he sold the property to plaintiffs. Defendants, however, have witnesses who claim that on one occasion they saw the plaintiffs' co-owner of the property place the nozzle of the gas tank hose into his vehicle.

As this evidence demonstrates, a genuine issue of dispute exists as to whether any of the contamination occurred prior to the transfer of the property to plaintiffs. Although circumstantial, the defendants' evidence that Mr. Zamds placed the nozzle of the gas tank hose into his vehicle could lead to the inference that there was gasoline in the tank. If there was gasoline in the tank, and if the amount of contamination was the lower of the estimates, all of the contamination could have occurred after the transfer of the property to the plaintiffs. If this were the case, the plaintiffs would be entirely responsible for the contamination. Alternatively, the plaintiffs' evidence is that the tanks were dry and the plaintiffs never used the tanks. If this were the case, the defendants would be entirely responsible for the contamination. As a final alternative, a fact-finder might conclude that the tanks were not dry when the property was transferred to the plaintiffs, but that not all of the contamination occurred after the transfer of the property. If this were the case, both the plaintiffs and the owner/operator defendants would be partially responsible for the contamination. As a result, the Court cannot grant summary judgment for either the plaintiffs or the defendants because the issue of contribution with respect to the owner/operator defendants is in genuine dispute.

C. THE RCRA CLAIM AGAINST DEFENDANT NACHANT

1. *As The Installer of the Piping System for the Gas Tanks, Defendant Nachant Stands in a Different Position from the Owner/Operator Defendants*

■ The liability of defendant Nachant is quite different than the liability of the

owner/operator defendants. Defendant Nachant did not own or operate the property or the gasoline pumps, but instead only installed the initial piping system. Whereas the owner/operator defendants are contributors regardless of what caused the contamination as long as it occurred while they owned or operated the gas station, defendant Nachant can only be held liable if the piping system contributed to the contamination. As a result, unlike the owner/operator defendants, with respect to whom the relevant inquiry was *when* the leaking occurred, the relevant inquiry with respect to Nachant is *how* the leaking occurred.

### 2. The Burden of Proof Will Not Be Shifted To Nachant

### a. Installation of a Gas System is not a Tortious Act Without A Showing of Defect in the Installation

■ The Court will not shift the burden of proof to an installer, such as defendant Nachant, without the showing of some defect in the installation. Notably, Nachant is not part of either of the owner/operator defendants' vertical enterprises. Although Nachant did install at least some portions of the gasoline system, the Court is again in the position of having to determine what Congress intended when it included "contribution" as an element of a RCRA claim. Had Nachant installed defective piping which caused contamination, the Court would not hesitate to hold that Congress intended this to lead to liability under RCRA. The Court does not believe, however, that Congress intended the "contributing to" language to mean that installation equals contribution. Even under a liberal interpretation of contribution, mere installation is not a tortious act.

Unquestionably, without the installation there could not have been contamination, and thus in a broad sense the installation contributed to the contamination.[6] The Court is not convinced, however, that Congress intended for an installer to be liable

for contamination caused by leaking in the piping that could not be traced to a defect. For example, such a rule would extend liability to the installer who uses the best available equipment, even if the contamination results from the equipment rusting due to normal use over a fifty year period. Any gas system will wear out over time. Whereas the owner and operator can take steps to repair and/or replace such equipment, and thus should be held responsible for contamination, the installer is separated from the equipment and the property once the installation is complete. This inability to take preventive measures warrants some limits on an installer's liability, even under strict liability. As a result, the Court, again in an effort to fill in a gap in RCRA, must define those limits.

For the reasons set forth above, the Court holds that an installer cannot be held liable under RCRA for contributing to contamination unless the plaintiff shows some defect in the installation. Although the plaintiffs allege the gas pumps were defective, they provide no evidence to support this allegation. Instead, they wish to shift the burden of proof to defendant Nachant on the issue of defect. The Court, however, is unaware of any opinion that has shifted the burden of proof on the proof of a defect. Again, the majority of cases using alternative liability are negligence cases, but repeatedly the cases hold that alternative liability cannot be used to prove the negligent conduct, but only to prove causation. *See, e.g.,* Restatement (2d) Torts § 433B(3), Comments f & g (before burden will be shifted, conduct of two or more actors must be proved to be negligent or otherwise tortious); *Clift v. Nelson*, 25 Wash.App. 607, 608 P.2d 647, 648 (1980) (plaintiff failed to show that each defendant behaved in a tortious manner). Similarly, the Court holds that the burden of proof cannot be shifted to an installer to show that he or she did not install a defective product. If a plaintiff can show a

---

**6.** Likewise, the NELSONS, having ordered and directed the installation, are not liable for all subsequent contamination. Without the NELSONS orders, the gas system would never have been installed. This, however, is insufficient contribution to hold them as an installer liable under RCRA.

defect, it might be appropriate, other requirements being met, to shift the burden of proof to the installer and other defendants on the issue of causation. The plaintiffs, having not met the initial requirement, cannot utilize this evidentiary procedure against defendant Nachant.

#### b. *Plaintiffs' Evidence Does Not Demonstrate That Plaintiffs' Have Joined All Potential Tortfeasors*

■ Even if the plaintiffs had made the requisite showing of a defect, they have not shown that the contamination occurred as a result of defendant Nachant's installations. Although the plaintiffs allege that Nachant installed the gas system, the evidence only supports a finding that Nachant installed the piping and the gas pumps. As a result, the plaintiffs have not shown that there are not other possible causes for the contamination who should be before the Court along with Nachant. Without these other potential defendants being joined, or at least their absence being explained, it would be inappropriate to proceed on a theory of alternative liability in any event.

More importantly, however, the burden of proof will not be shifted where there is only one defendant before the court.[7] Comment (g) to § 433B subsection 3 of Restatement (2d) Torts states: "the rule has no application to cases of alternative liability where there is no proof that the conduct of *more than one* actor has been tortious at all." Restatement (Second) Torts § 433B(3), Comment (g) (emphasis added). *See also Lee v. Baxter Healthcare Corp.*, 721 F.Supp. 89, 94 (D.Md.1989).

#### c. *Plaintiffs Had Best Access to Evidence*

■ Finally, even if the plaintiffs' evidence warranted a shifting of the burden

of proof, it would be inappropriate to shift the burden of proof to defendant Nachant because the piping was in the ownership and possession of plaintiffs at the time contamination was found, and plaintiffs failed to fully inspect and test the components of the tank system. *See, e.g., Long v. Krueger, Inc.*, 686 F.Supp. 514, 520 (E.D.Pa.1988) (plaintiff had adequate opportunity to inspect and preserve as evidence the allegedly defective evidence and failed to do so); *Bradley v. Firestone*, 590 F.Supp. 1177, 1179 (D.S.D.1984) (inability to identify manufacturer was fault of plaintiff). In contrast to the noneffect this fact had with respect to the owner/operator defendants, the plaintiffs' control over this evidence affects defendant Nachant's position because it is likely this evidence would be helpful, if not dispositive, of the issue of whether the piping caused the contamination (i.e., *how* the contamination occurred). Moreover, the plaintiffs' explanation (that they were unrepresented by counsel at the time of removal, had no idea that massive contamination might be present, and did not think future litigation would be necessary) does not justify the plaintiffs' failure to fully inspect and test the components of the tank system. As a result, the plaintiffs' control over this evidence mandates the burden of proof not be shifted as to defendant Nachant.

#### 3. *Summary Judgment Is Granted Sua Sponte for Defendant Nachant*

Defendant Nachant's failure to file a motion for summary judgment does not preclude the Court from granting summary judgment for defendant Nachant. *See Cool Fuel, Inc. v. Connett*, 685 F.2d 309, 311 (9th Cir.1982) ("if one party moves for

---

7. The Court recognizes that there are other defendants in this case. The theories of liability against the owner/operator defendants, however, are separate and distinct from the theory of liability against defendant Nachant. As a result, for the purposes of alternative liability, the presence of these defendants is not relevant.

In the ordinary contamination case, both the owner and the operator will be liable for contamination that occurred during their connection to the property. Additionally, the installer may *also* be liable for contamination that occurred because of a defect in installation. Alternative liability involves situations where there is a question between defendants as to which defendant caused the injury (i.e., if it is not defendant A, then it is defendant B in the alternative, and visa versa). The theory is not applicable where certain defendants are liable, and the question is only as to whether an additional defendant will also be found liable.

summary judgment and, at the hearing, it is made to appear from all the records, files, affidavits and documents presented that there is no genuine dispute respecting a material fact essential to the proof of movant's case and that the case cannot be proved if a trial should be held, the court may *sua sponte* grant summary judgment to the non-moving party") (citations omitted). As a result, the Court grants summary judgment for defendant Nachant *sua sponte*. There is no genuine issue of dispute with respect to Nachant's contribution to the leakage. The plaintiffs have not presented sufficient evidence for the Court to shift the burden of proof to defendant Nachant on this element. Moreover, the Court will not shift the burden of proof to the installer in any event because of the plaintiffs' control over key evidence. As a result, the plaintiffs' claim cannot be proven.

### V

### CONCLUSION

IT IS HEREBY ORDERED that civil cases No. 89–0989–GT (CM) and 90–1144–GT (CM) are consolidated.

IT IS HEREBY ORDERED that the plaintiffs' motion for summary judgment is DENIED.

IT IS HEREBY ORDERED that the motions for summary judgment filed by defendants NELSONS and GOODWINS, and joined by TACEY, are DENIED.

IT IS HEREBY ORDERED that summary judgment is GRANTED *sua sponte* for defendant NACHANT.

IT IS HEREBY FURTHER ORDERED that summary adjudication of all elements of the plaintiffs' claim is GRANTED in favor of the plaintiffs, except for the element of contribution. As to the element of contribution, the Court finds that leakage of gasoline from this gas station caused the contamination, but a genuine issue of dispute remains as to when this contamination occurred. As a result, the Court will bifurcate the trial. The first stage of the trial will resolve the question of contribution and will focus on the unresolved questions of (1) whether any of the contamination occurred prior to the transfer of the property to plaintiffs and (2) if contamination occurred both before and after the transfer of property to plaintiffs, how much contamination occurred after the transfer of the property to plaintiffs. The second stage of the trial will provide each of the owner/operator defendants the opportunity, if any can, to shift liability to the remaining defendants by proving the contamination did not occur while a specific defendant either owned or operated the gas station, even though the contamination did occur while the gas station was collectively owned and operated by the owner/operator defendants.

IT IS SO ORDERED.