Revised August 6, 2001

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 99-11029

_____


HAROLD COX; SHIRLEY DAVIDSON; ROBERT STUBBLEFIELD; CYNTHIA
HERRING; ELOUISE EDWARDS; BETTY CURLEY; LEO EASTER

                    Plaintiffs - Appellees - Appellants

    v.

CITY OF DALLAS TEXAS; ET AL

                    Defendants

JEFFREY A SAITAS, Executive Director of the Texas Natural
Resource Conservation Commission

                    Defendant - Appellee

------------------------------------------

HAROLD COX; SHIRLEY DAVIDSON; ROBERT STUBBLEFIELD; CYNTHIA
HERRING; ELOUISE EDWARDS; BETTY CURLEY; LEO EASTER

                    Plaintiffs - Appellees

    v.

CITY OF DALLAS TEXAS; ET AL

                    Defendants

CITY OF DALLAS TEXAS

                    Defendant - Appellant
_____

        Appeal from the United States District Court
            for the Northern District of Texas
_____

June 26, 2001

Before KING, Chief Judge, PARKER, Circuit Judge, and FURGESON,[*] District Judge.

KING, Chief Judge:

Plaintiffs Harold Cox et al. filed suit against Defendant City of Dallas, Texas and Defendant Jeffrey A. Saitas, Executive Director of the Texas Natural Resource Conservation Commission, alleging violations of the Resource Conservation and Recovery Act, 42 U.S.C. § 6901 et seq. The City appeals from the district court's judgment granting Plaintiffs injunctive relief under § 6972(a)(1)(B). Plaintiffs appeal from the district court's judgment denying injunctive relief against Saitas. For the following reasons, we AFFIRM.

## I. FACTUAL AND PROCEDURAL BACKGROUND

This case involves two consolidated citizen suits brought pursuant to the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6901 et seq., concerning two open garbage dumps in Dallas, Texas — an 85-acre lot located at 523 Deepwood Street

---

[*] District Judge of the Western District of Texas, sitting by designation.

(the "Deepwood dump")[1] and an adjacent 40-acre lot (the "South Loop 12 dump").[2]

Zoned for residential use, the Deepwood and South Loop 12 dumps have been used for sand and gravel mining and illegal dumping for over twenty-five years. Substantial deposits of uncovered solid waste, including household waste, tires, demolition debris, insulation, asphalt shingles, abandoned automobiles, jugs and bottles labeled "sulfuric acid" and "nitric acid," 55-gallon drums, and syringes, are on the properties.[3] The dumps adjoin residential neighborhoods and a tributary to the

---

[1] The Deepwood dump is also known by the addresses 500 Deepwood Street and 300 South Jim Miller Road.

[2] This dump is located directly north of the Deepwood dump.

[3] "Solid waste" includes "any garbage, refuse, sludge . . . and other discarded material." 42 U.S.C. § 6903(27). From the RCRA's inception, Congress made clear that it intended the term "solid waste" to be viewed with a wide lens:

> In addressing the problem, the Committee recognizes that Solid Waste, the traditional term for trash or refuse, is inappropriate. The words solid waste are laden with false connotations. They are more narrow in meaning than the Committee's concern. The words discarded materials more accurately reflect the Committee's interest. . . . the term discarded materials is used to identify collectively those substances often referred to as industrial, municipal or post-consumer waste; refuse, trash, garbage and sludge. . . . It should be noted that discarded materials are generated from a multitude of sources in every sector of the nation's life.

H.R. REP. NO. 94-1491, Part I, at 2-3 (1976), reprinted in 1976 U.S.C.C.A.N. 6238, 6240.

3

Trinity River and are partially in the flood plain of the Trinity River. Neither dump has been upgraded or closed according to sanitary landfill criteria. See 42 U.S.C. § 6944(a). Residents adjacent to the dumps report the appearance of snakes and rats in their backyards since the beginning of the illegal dumping, and the dumps are easily accessible to children in the neighborhood.[4] Since at least 1976, the State of Texas and the City of Dallas, Texas (the "City") have been aware of open dumping on both sites.

## A. History of the Deepwood Dump

In August 1976, officials from the Texas Natural Resource Conservation Commission (the "TNRCC")[5] and the City's sanitation department visited the Deepwood dump and prepared a report that called for continuing surveillance of the site. In 1983, the City conducted soil and water tests at the Deepwood dump in response to complaints from nearby residents that illegal dumping was taking place. The City's report and test results, which made

---

[4]  The City, in partial compliance with the district court's injunction in this case, has now constructed a fence around the sites. See infra note 15 and accompanying prior text (describing the district court's injunction against the City).

[5]  Defendant Jeffrey A. Saitas is the current Executive Director of the TNRCC, the Texas agency charged with the responsibility of overseeing environmental laws relating to dumping. Both the name of the relevant state agency and the identity of the director have changed throughout the years. We will refer to the director as "Saitas" and the agency as the "TNRCC," without attempting to chronicle those changes, as they are irrelevant to this appeal. We will refer to Saitas, the TNRCC, and the State of Texas as the "the State," except where necessary to make a distinction for clarity.

clear that the Deepwood dump was being used for the disposal of solid waste, were sent to the State for analysis.

In 1987, the City filed suit in state court against the owners of the Deepwood dump for dumping solid waste without a state permit and joined the TNRCC as a necessary party. In December 1989, the state court entered a final judgment, requiring the Deepwood dump owners to submit and implement a plan for closure of the site. An April 1991 inspection revealed that the Deepwood dump had not been cleaned up or closed, and the City filed a contempt motion. This motion was not heard by the state court, and no further action was taken by the State or the City to enforce the judgment.

During this time, the City contracted with Billy Nabors and Dallas Demolition Excavating Co. ("Dallas Demolition") to conduct demolitions of City property. These City contractors disposed of their debris at the Deepwood dump. The City's contracts with Dallas Demolition did not specify that waste materials generated by City activities must be properly disposed of in a legal landfill. The City was aware that Dallas Demolition dumped at the Deepwood dump. However, even after the City's attorneys had learned of Dallas Demolition's illegal acts, the City continued to use Dallas Demolition.

Also, the City designed and implemented a plan to reclaim the area from the flood plain by depositing fill material in the low spots. The plan's objective was to collect more tax revenue

5

from the area by eventually rezoning it for industrial purposes. In 1982, Terry Van Sickle began operating the Deepwood dump with land use and fill permits issued by the City. Van Sickle overtly stated his intention to dump solid waste at the Deepwood dump when he submitted his application to the City: "Fill old pits with solid waste 'means all putrescible and non putrescible discarded materials or unwanted rock, dirt, metal, sand gravel wood etc. [sic]." The City subsequently issued a certificate-of-occupancy permit based on this application. While this certificate stated that the use was to be for the "mining of sand and gravel,"[6] it did not specifically restrict the types of fill material. Furthermore, the City's Public Works Department later granted Van Sickle "[p]ermission to fill the mined areas." This grant also did not restrict the types of fill material, although Van Sickle had made his intentions clear regarding the solid waste fill he wished to employ in the dump. In its own documents, the City admits that "control at the site[s] has been loose and in a few cases improper material has been used for fill . . . [and] some approved flood plain areas have had large amounts of decomposable material placed in them."

At a Board of Adjustment hearing, the City considered the impact of operations at the Deepwood dump on the community.

---

[6] We note that, in their documents, City officials consistently referred to Deepwood as a dump, and not as a sand or gravel mine, quarry, or pit.

Although residents adjacent to the dump provided information about the illegal dumping and the hazards at the dump and requested that the Board put an end to the use of the dump, the Board did not act to terminate the dumping. Plaintiffs contend that it was in the City's interest to continue the filling of the land because it would further the City's plan of elevating the area, thus reclaiming it from the flood plain (which would then permit the City to rezone the land for industrial use, making the area more financially profitable for the City). Until the district court's injunction, the City had never revoked the certificate-of-occupancy permit for the Deepwood site.

Herman Nethery, the current owner of the Deepwood dump, operated an illegal open dump at the Deepwood site from 1994 through 1997. The State inspected the Deepwood dump several times from 1995 to 1997 and discovered massive illegal dumping, including asbestos, benzene, and medical waste.[7] The State also noted in its own reports that there was an imminent threat of the discharge of municipal solid waste into Elam Creek, a tributary of the Trinity River, because of the concentrated dumping. In addition, the State observed that shingles and construction and demolition debris at the dump may cause contamination of surface

---

[7]  The Deepwood dump had become so large that other waste handlers, such as BFI and Waste Management, actually noticed a decrease in the volume of solid waste they transported; after inquiries, they discovered that the decrease stemmed from the fact that waste was being illegally dumped at the Deepwood dump.

and ground water through the leaching of contaminates from the debris by rainwater.  For several months during 1988 and during 1997, the Deepwood dump caught fire and burned, and a significant fire hazard still exists at the site.

Despite this history, in August 1994, the City granted Nethery a permit allowing mining use of the Deepwood dump.  The City failed to follow its own procedures of issuing permits: no inspection was conducted prior to the issuance of the permit, and no test zone was established around the areas where illegal solid waste had been deposited.

In 1995, the City filed suit against Nethery in state court alleging violations of the Texas Solid Waste Disposal Act (the "TSWDA"), and the State intervened.  The state court entered judgment against Nethery for $15,000,060.  The judgment does not require that any of the imposed civil penalties be used for cleaning up the dump.  In addition to the state civil actions, the State criminally prosecuted Nethery and Herman Lee Gibbons, an operator at the Deepwood dump.  Both were convicted of violating Texas organized crime laws relating to the financing of the illegal dump, and both were incarcerated in Texas on those charges.

The City informed the State and the United States Environmental Protection Agency ("EPA") that the Deepwood dump poses long-term fire and health hazards for the neighborhood and

requested funds to remediate the dump.  The State and the EPA
refused to provide funds to clean up the dump.


### B. History of the South Loop 12 Dump

In 1964, the City entered into an agreement to use the South
Loop 12 site as a sanitary landfill.  In 1972, the then-owner of
the site excluded the City from dumping because the City had not
complied with the conditions in the agreement (i.e., to cover the
refuse that it had dumped with at least eighteen inches of
compact soil).  In addition, the City never canceled this
agreement.  In 1989, the City and the State sued the owners of
the South Loop 12 dump in state court for violating the TSWDA.
The state court entered an Agreed Final Judgment in 1990,
ordering the owners to clean up the dump.  An April 1991
inspection found that no corrective action had been taken, but
the City and State did nothing to gain compliance with the 1990
judgment.[8]  As was the case with the Deepwood dump, there
currently exists a substantial danger of fires from the solid
waste present on the site, and the dump is also easily accessible
to children.[9]  The South Loop 12 site remains an open dump, and

---

[8]   A state inspector noted:  "The solid waste which is
being dumped is [on] the area on the east side along the alley
behind [the] homes.  This area of waste is getting larger."

[9]   But see supra note 4.

the State has not cleaned, and does not intend to clean up, the site.


### C. Procedural History of Current Litigation

In February 1997, Plaintiffs, homeowners in residential areas adjoining these dumps, brought a citizens suit in federal court against the owners of the Deepwood dump,[10] the City, and Saitas for injunctive relief under the RCRA, 42 U.S.C. § 6972(a)(1).  This suit was consolidated with Plaintiffs' July 1998 citizens suit against the City and Saitas regarding the South Loop 12 dump.  Plaintiffs alleged, <u>inter alia</u>, that the City violated 42 U.S.C. § 6972(a)(1)(B) by "contributing to" illegal open dumping at both sites, that Saitas failed to classify the dumps on the EPA's Open Dump Inventory ("ODI"), and that Saitas failed to comply with the corresponding RCRA obligation of cleaning up the dumps.[11]

---

[10]  Plaintiffs sued Nethery and Van Sickle.

[11]  Plaintiffs alleged that Saitas has the obligation to classify all solid waste facilities in Texas either as open dumps or sanitary landfills, to list the open dumps on the ODI, and to take the steps necessary to close or upgrade the open dumps in compliance with federal sanitary landfill criteria.  Plaintiffs' arguments distill to the following core complaint:  Saitas deliberately chose not to classify, close, or upgrade the illegal, unauthorized solid waste facilities in Texas (i.e., the Deepwood and South Loop 12 dumps) according to RCRA requirements. Plaintiffs asserted various other claims against Saitas that are not raised on appeal.

On October 5, 1998, the district court certified an injunctive relief class of homeowners near or adjacent to the Deepwood dump. As to the South Loop 12 dump, Plaintiffs are all individually named. On December 17, 1998, the district court bifurcated the injunctive relief and damages[12] portions of the suits. The court then held a bench trial regarding the injunctive relief claims on July 14, 1999. The Final Judgment, entered on August 27, 1999,[13] granted Plaintiffs injunctive relief against the City on both dumps, finding that the City had "contributed to" illegal open dumping, but denied injunctive relief against Saitas.[14] The district court's injunction required the City, inter alia, to (1) erect a fence around both sites, (2) monitor the sites for methane gas and fire hazards, (3) prevent future open dumping, (4) remove all solid waste from the sites without harming adjoining properties, and (5) restore the sites to non-hazardous conditions. See Meghrig v. KFC Western, Inc., 516 U.S. 479, 484 (1996) (stating that "a private citizen suing under § 6972(a)(1)(B) could seek a mandatory injunction, i.e.,

---

[12] These damages claims (which do not arise under the RCRA) alleged (1) race discrimination against the City as to both the Deepwood and South Loop 12 dumps, and (2) common law nuisance against Nethery as to the Deepwood dump.

[13] On August 4, 1999, the district court had filed a detailed Court's Findings of Fact and Conclusions of Law.

[14] Plaintiffs also prevailed against Nethery and Van Sickle. Nethery filed a notice of appeal with this court, but failed to pay the requisite fee, thus waiving his appeal.

one that orders a responsible party to 'take action' by attending to the cleanup and proper disposal of toxic waste, or a prohibitory injunction, i.e., one that 'restrains' a responsible party from further violating [the] RCRA").

The City timely appealed, claiming that the district court erred in holding that the City "contributed to" dumping at the sites.[15] Plaintiffs also timely appealed, arguing that the district court erred in holding that Saitas could not be held liable for violating the RCRA.

## II. STANDARD OF REVIEW

"We review the district court's findings of fact for clear error and legal issues <u>de novo</u>. However, we may affirm for reasons other than those relied upon by the district court." <u>Joslyn Mfg. Co. v. Koppers Co., Inc.</u>, 40 F.3d 750, 753 (5th Cir. 1994) (citations omitted). A district court's ruling is not clearly erroneous unless we are left with the definite and firm conviction that a mistake has been made. <u>See</u> <u>United States v. Bentley-Smith</u>, 2 F.3d 1368, 1377 (5th Cir. 1993). In addition, "[w]e review the district court's grant of a permanent injunction for abuse of discretion." <u>Hopwood v. Texas</u>, 236 F.3d 256, 276 (5th Cir. 2000).

---

[15] After the Final Judgment, the City moved for, and was granted, a partial stay of the injunction pending this appeal.

12

## III. THE CITY'S APPEAL

In the district court, Plaintiffs asserted the following four claims against the City: (1) "contributing to" liability under 42 U.S.C. § 6972(a)(1)(B) at the Deepwood dump, (2) "contributing to" liability under § 6972(a)(1)(B) at the South Loop 12 dump, (3) liability under § 6945(a) at the Deepwood dump, and (4) liability under § 6945(a) at the South Loop 12 dump. The district court found the City liable under § 6972(a)(1)(B) for both the Deepwood and South Loop 12 dumps, but found that Plaintiffs had not met their burden as to their § 6945(a) claims. Plaintiffs are not appealing the district court's decision on the § 6945(a) claims, but the City is appealing the liability findings under § 6972(a)(1)(B).

In order to supply a better understanding of the RCRA, we provide at the outset a brief description of nuisance at common law. We then lay out the statutory framework of "contributing to" liability under § 6972(a)(1)(B). Finally, we assess whether the district court's ruling that the City fell within the statutory reach of § 6972(a)(1)(B) was in error.

### A. Nuisance at Common Law

Nuisance principles form the core doctrinal foundation for modern environmental statutes, including the RCRA. The nuisance action originated in the twelfth century. See RESTATEMENT (SECOND) OF TORTS § 821D cmt. a (1979). Courts first recognized "private"

13

nuisances, see id., and by the sixteenth century, began to recognize "public" nuisances, see id. § 821C cmt. a. "A private nuisance is a nontrespassory invasion of another's interest in the private use and enjoyment of land." Id. § 821D. A public nuisance, on the other hand, involves an unreasonable interference with a right common to the general public. See id. § 821B. In determining whether conduct amounts to a public nuisance, courts consider, inter alia, whether the conduct involves a significant interference with public health, safety, peace, comfort, or convenience. See id. Private and public nuisances are not set apart in rigid, mutually exclusive categories. On the contrary, "[w]hen the nuisance, in addition to interfering with the public right, also interferes with the use and enjoyment of the plaintiff's land, it is a private nuisance as well as a public one." Id. § 821C cmt. e. See also, e.g., Ozark Poultry Prods., Inc. v. Garman, 472 S.W.2d 714, 715 (Ark. 1971) (stating that landowners' suit against a factory that polluted air and water could be both a public and private nuisance).

These interests (i.e., in a public right and in the use and enjoyment of one's land) "may be invaded by any one of the types of conduct that serve in general as bases for all tort liability." RESTATEMENT (SECOND) OF TORTS § 822 cmt. a. The Restatement explains that one is subject to liability for a private nuisance (1) if one's conduct is the legal cause of an

14

invasion of another's interest and (2) if the invasion is either (a) "intentional and unreasonable" or (b) "unintentional and otherwise actionable under the rules controlling liability for negligent or reckless conduct, or for abnormally dangerous conditions or activities."  Id. § 822.  The rules of strict liability, i.e., liability imposed without regard to the defendant's negligence or intent to harm,[16] are frequently applied to abnormally dangerous activities, see RESTATEMENT (SECOND) OF TORTS § 519 (1977), although they are imposed in other nuisance situations as well.[17]

---

[16] "It is probable that the § 829A strict-liability idea [see infra note 17] is generally consistent with the strict-liability concept set forth in [§ 20]." RESTATEMENT (THIRD) OF TORTS: LIABILITY FOR PHYSICAL HARM (BASIC PRINCIPLES) § 20 cmt. c (Tentative Draft No. 1, Mar. 28, 2001) (tentatively approved at the American Law Institute Annual Meeting, May 14-17, 2001). Strict liability is essentially defined as "liability imposed without regard to the defendant's negligence or intent to harm. . . . [S]trict liability signifies liability without fault, or at least without any proof of fault." RESTATEMENT (THIRD) OF TORTS: LIABILITY FOR PHYSICAL HARM (BASIC PRINCIPLES) ch. 4 scope note; see also PROSSER AND KEETON ON THE LAW OF TORTS § 75, at 534 (W. Page Keeton et al. eds., 5th ed. 1984) (stating that strict liability "means liability that is imposed on an actor apart from either (1) an intent to interfere with a legally protected interest without a legal justification for doing so, or (2) a breach of a duty to exercise reasonable care").  However, it is important "to observe that there is no single theory for strict liability in tort." RESTATEMENT (THIRD) OF TORTS: LIABILITY FOR PHYSICAL HARM (BASIC PRINCIPLES) ch. 4 scope note.  But, "at a minimum, strict-liability doctrines do require that the defendant's conduct or activity be a cause of the plaintiff's injury." Id. (emphasis added).

[17] "While § 829A[, which further defines the term 'unreasonable' used in the general rule of § 822,] is explained in the language of unreasonableness, that section in essence rests on an idea of strict liability: that it is appropriate for

The private nuisance liability framework of Restatement § 822 is also generally applicable in public nuisance situations. See RESTATEMENT (SECOND) OF TORTS § 822 cmt. a. However, public nuisance law tends to impose liability more often on the basis of strict liability. See, e.g., New York v. Shore Realty Corp., 759 F.2d 1032, 1051 (2d Cir. 1985) (applying New York law and stating that liability for public nuisance exists "irrespective of negligence or fault"); Concerned Citizens of Bridesburg v. City of Phila., 643 F. Supp. 713, 726 (E.D. Pa. 1986) ("At common law, neither individuals nor municipalities have the right to maintain for any period of time activities that constitute a public nuisance, irrespective of lack of fault or due care."); Wood v. Picillo, 443 A.2d 1244, 1248 (R.I. 1982) (stating, in a case in which multiple private plaintiffs sued under public and private nuisance alleging that the defendants' chemical dump site was polluting the soil, that "generally this court has not required plaintiffs to establish negligence in nuisance actions"); id. at 1247 (stating that "liability in nuisance is predicated upon unreasonable injury, rather than upon unreasonable conduct"); Branch v. W. Petroleum, Inc., 657 P.2d 267, 274 (Utah 1982) ("Unlike most torts, [nuisance law] is not concerned with the nature of the conduct causing the damage, but with the nature and

the defendant to compensate the plaintiff even though the defendant has in general behaved in a reasonable way." RESTATEMENT (THIRD) OF TORTS: LIABILITY FOR PHYSICAL HARM (BASIC PRINCIPLES) § 20 cmt. c.

16

relative importance of the interests interfered with or invaded.").[18]

Two basic remedies are available in nuisance actions – damages and injunctions. See RESTATEMENT (SECOND) OF TORTS § 821B cmt. i; id. § 821C (stating that to maintain a damage action for a public nuisance, the plaintiff must have suffered damage different in kind from that suffered by the general public and that to maintain an injunctive action for a public nuisance, the

---

[18] However, some courts have applied a more fault-based scheme to public nuisance actions brought by private plaintiffs (as opposed to actions brought by the sovereign). See, e.g., Quinnett v. Newman, 568 A.2d 786, 789 (Conn. 1990). This distinction (between private and public plaintiffs) stems from the origin of public nuisances, in which such nuisances were treated as crimes at common law (which, of course, were within the purview of the state's police power). See RESTATEMENT (SECOND) OF TORTS at § 822 cmt. a; PROSSER AND KEETON ON TORTS § 90. Although public nuisances are no longer treated only as crimes, they continue to be considered intrusions on the public welfare. See RESTATEMENT (SECOND) OF TORTS § 821B cmt. b. As such, the degree to which the defendant is at fault is less important than the state's interest. See Starr v. Comm'r of Envtl. Prot., 627 A.2d 1296, 1315 (Conn. 1993) ("Because a public nuisance implicates the rights of the public and the exercise of the state's police power, the legislature could legitimately determine that the plaintiff's lack of culpability for the existence of the contaminated condition is outweighed by the state's interest in protecting public resources."). This rationale for imposing liability without regard to fault does not translate completely when the plaintiff is a private citizen.
    However, the above potential basis for differentiation between private and public plaintiffs in public nuisance law does not retain full force when private plaintiffs sue in the context of statutory citizen suit provisions (which permit private parties to act essentially in place of the governmental entity when it is unable or unwilling to take action). These citizen suit provisions are common in environmental statutes, such as the RCRA. See, e.g., 42 U.S.C. § 6972(a)(1) (RCRA citizen suit provisions); 33 U.S.C. § 1365(a)(1) (Clean Water Act citizen suit provision).

17

plaintiff must have a right to recover damages or the authority to represent a political subdivision in the matter or standing to sue in a citizen's action); id. § 821F (revealing that a private or public nuisance action for damages may be maintained only by those who have suffered "significant harm"); id. § 822 cmt. d (providing that an "injunction may be obtained in a proper case against a threatened private nuisance, but an action cannot be maintained at law unless harm has already been suffered" and referencing § 821C for a similar distinction in the realm of public nuisances); see also Developments in the Law – Injunctions, 78 HARV. L. REV. 994, 1001 (1965) (explaining that injunctions are usually granted when damages are inadequate, such as with ongoing nuisances in which numerous suits or future damage awards would be required).

The theory of nuisance lends itself naturally to combating the harms created by environmental problems. See Geo-Tech Reclamation Indus., Inc. v. Hamrick, 886 F.2d 662, 665 (4th Cir. 1989) (stating that "the operation of a landfill . . . was recognized as a nuisance even by the early common law"). One commentator succinctly described environmental jurisprudence, stating: "The deepest doctrinal roots of modern environmental law are found in principles of nuisance. . . . Nuisance actions have involved pollution of all physical media — air, water, land — by a wide variety of means. . . . Nuisance actions have challenged virtually every major industrial and municipal

activity which is today the subject of comprehensive environmental regulation . . . . Nuisance theory and case law is the common law backbone of modern environmental and energy law." WILLIAM H. RODGERS, JR., HANDBOOK ON ENVIRONMENTAL LAW § 2.1, at 100 (1977).

Specifically, as regards the RCRA, Congress indicated that the statute embodied common law concepts of nuisance. See S. REP. NO. 96-172, at 5 (1979), reprinted in 1980 U.S.C.C.A.N. 5019, 5023 ("[The RCRA] is essentially a codification of common law public nuisance remedies. . . . [and], therefore, incorporates the legal theories used for centuries to assess liability for creating a public nuisance (including [the theories of] intentional tort, negligency, and strict liability) and to determine appropriate remedies . . . . However, . . . . [s]ome terms and concepts . . . are meant to be more liberal than their common law counterparts."); cf. Solid Waste Agency v. U.S. Army Corps of Eng'rs., 101 F.3d 503, 505 (7th Cir. 1996) (noting that the interests protected by the Clean Water Act "overlap to a great extent the interests that nuisance law protects"). See generally infra Part III.B.2.

Having provided a brief summary of the common law negligence principles that underlie the RCRA, we next proceed to lay out the regulatory framework of the RCRA as it applies to the facts of this case.

## B. Section 6972(a)(1)(B)

Section 6972(a)(1)(B) of the RCRA provides in relevant part:

[A]ny person may commence a civil action on his own behalf — against any person, including the United States and any other governmental instrumentality or agency, to the extent permitted by the eleventh amendment to the Constitution, and including any past or present generator, past or present transporter, or past or present owner or operator of a treatment, storage, or disposal facility, <u>who has contributed or who is contributing to</u> the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment.

42 U.S.C. § 6972(a)(1)(B) (emphasis added).

Parsing the language of § 6972(a)(1)(B), we find it contains essentially three elements. To prevail on a "contributing to" claim, a plaintiff is required under § 6972(a)(1)(B) to demonstrate: (1) that the defendant is a person, including, but not limited to, one who was or is a generator or transporter of solid or hazardous waste or one who was or is an owner or operator of a solid or hazardous waste treatment, storage, or disposal facility; (2) that the defendant has contributed to or is contributing to the handling, storage, treatment, transportation, or disposal of solid or hazardous waste[19]; and (3)

---

[19] As an aside, with reference to the discussion of nuisance at common law <u>supra</u> in Part III.A, we note that nuisance liability at common law has been based on actions which "contribute" to the creation of a nuisance. <u>See, e.g.</u>, <u>King v. Columbian Carbon Co.</u>, 152 F.2d 636, 641 (5th Cir. 1945) (stating, in a case under Texas law, that: "Our conclusion is that nuisances may exist without negligence and in such situations it, of course, is not requisite that negligence be alleged, but in all cases where negligence has created, or <u>contributed to</u> the creation of, the nuisance such negligence should be alleged."

20

that the solid or hazardous waste may present an imminent and substantial endangerment to health or the environment.  See, e.g., United States v. Aceto Agric. Chems. Corp., 872 F.2d 1373, 1382 n.9 (8th Cir. 1989); Zands v. Nelson ("Zands II"), 797 F. Supp. 805, 809 (S.D. Cal. 1992).

We turn now to the district court's finding that the City falls within the statutory reach of § 6972(a)(1)(B) for both the Deepwood and South Loop 12 dumps.

*1. Any Person*

First, the RCRA states that "any person" may be held liable, "including" past or present generators, transporters, owners, or operators.  See 42 U.S.C. § 6972(a)(1)(B); H.R. REP. NO. 98-198, Part I, at 48 (1983), reprinted in 1984 U.S.C.C.A.N. 5576, 5607 (stating that "anyone who has contributed or is contributing to the creation, existence, or maintenance of an imminent and

---

(emphasis added)); New Jersey v. Gloucester Envtl. Mgmt. Servs., Inc., 821 F. Supp. 999, 1012, 1012-13 (D.N.J. 1993) (stating, in a case under New Jersey law, that "one who creates or contributes to the creation of the nuisance is generally liable for that nuisance" and that "[i]t is enough for a nuisance claim to stand that the municipalities allegedly contributed to the creation of a situation which, it is alleged, unreasonably interfered with a right common to the general public" (emphasis added)); Attorney Gen. v. Baldwin, 279 N.E.2d 710, 717 n.3 (Mass. 1972) (stating that "[i]t is not necessary to show that the person charged committed the particular act that created the nuisance; it is sufficient if he contributed thereto" (emphasis added)); Wilson v. Key Tronic Corp., 701 P.2d 518, 525 (Wash. Ct. App. 1985) (finding the following jury instruction proper under Washington law: "One who creates and/or contributes to the creation of a nuisance is liable to any person whose property is injuriously affected or whose personal enjoyment is lessened by the nuisance." (emphasis added)).

21

substantial endangerment is subject to [the RCRA]" and that "such persons include, <u>but are not limited to</u>, past and present generators . . . , past and present owners and operators . . . , and past and present transporters" (emphasis added)); <u>Zands II</u>, 797 F. Supp. at 809 (stating that "the word 'including' does not limit the definition of the word 'person'"); <u>cf.</u> <u>Cobell v. Norton</u>, 240 F.3d 1081, 1100 (D.C. Cir. 2001) ("It is hornbook law that the use of the word including indicates that the specified list . . . that follows is illustrative, not exclusive." (alteration in original) (internal quotations omitted) (quoting in parenthetical <u>Puerto Rico Maritime Shipping Auth. v. ICC</u>, 645 F.2d 1102, 1112 n.26 (D.C. Cir.1981)); <u>United States v. Grassie</u>, 237 F.3d 1199, 1215 (10th Cir. 2001) (regarding "the statutory use of the word 'including' . . . as the preface for a representative or illustrative example, and not as a term of restriction or exclusion for anything not expressly specified"); <u>United States v. Canada</u>, 110 F.3d 260, 263 (5th Cir. 1997) (stating that the term "includes" indicates a non-exhaustive list).

In addition, it is undisputed[20] that the City has been and is a generator of solid waste.[21]  Municipal activities, such as basic

---

[20]  In fact, no party raises this issue, proceeding on the implicit assumption that the City is a generator of solid waste.

[21]  We note that § 6972(a)(1)(B) also specifically applies to past contributors, as the phrase "past and present" modifies generators, transporters, owners, and operators.  <u>See</u> 42 U.S.C.

office operations in city buildings, demolition, and construction, generate waste.  See Meghrig, 516 U.S. at 483 (stating that the "RCRA is a comprehensive environmental statute"); C & A Carbone, Inc. v. Town of Clarkstown, 511 U.S. 383, 408 (1994) (O'Connor, J., concurring in judgment) (stating that the "RCRA is a sweeping statute intended to regulate solid waste from cradle to grave"); 1 JAMES T. O'REILLY ET AL., RCRA AND SUPERFUND: A PRACTICE GUIDE WITH FORMS § 2.08, at 2-25 (2d ed. 2000) ("The 'cradle to grave' intent of the RCRA law is illustrated by the law's inclusion of generators, transporters, and disposers within the broad reach of the statute."); see also Zands v. Nelson, 779 F. Supp. 1254, 1257 (S.D. Cal. 1991) ("Zands I") (stating that the term "generators" indicates that the "RCRA applies to individuals who do no more than create solid waste"). Specifically, on this record, the City generated solid waste through its demolition activities.

*2. Has Contributed to or Is Contributing to*

Second, the district court did not err as a matter of law in interpreting the "contributing to" prong of § 6972(a)(1)(B).  In addition, its finding that the City satisfied the requirements of the provision was not clear error.  In so concluding, we first

---

§ 6972(a)(1)(B); cf. H.R. CONF. REP. NO. 98-1133, at 119 (1984), reprinted in 1984 U.S.C.C.A.N. 5649, 5690 (stating that "persons who have contributed in the past or are presently contributing to the endangerment [of health or the environment], including but not limited to generators," have always been liable under § 6973, see infra note 22).

23

lay out the basic framework that will guide our analysis and then examine the evidence relating to each dump.

### *a. Construction of the Term "Contribute"*

The RCRA does not define the term "contribute" or any variation thereof. "This silence compels us to 'start with the assumption that the legislative purpose is expressed by the ordinary meaning of the words used.'" Russello v. United States, 464 U.S. 16, 21 (1983) (quoting Richards v. United States, 369 U.S. 1, 9 (1962)); see also Green Tree Fin. Corp. v. Randolph, 121 S. Ct. 513, 519 (2000) (stating that "[b]ecause the [statute] does not define [a term] or otherwise suggest that the ordinary meaning of [the term] should not apply, [the Supreme Court accords] the term its well-established meaning"); Asgrow Seed Co. v. Winterboer, 513 U.S. 179, 187 (1995); cf. Hallstrom v. Tillamook County, 493 U.S. 20, 31 (1989) (adopting plain language meaning for the RCRA notice requirement in § 6972(b)).

Webster's Dictionary defines "contribute" as to "have a share in any act or effect." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 496 (unabridged) (1963); see also OXFORD ENGLISH DICTIONARY 849 (2d ed. 1989) ("to have a part or share in producing [an effect]"); THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 410 (3d ed. 1992) ("to help bring about a result").[22]

---

[22] That the definition indicates a "non-narrow" construction of "contribute" is also supported by the relevant legislative history. See S. REP. NO. 96-172, at 5 (1979), reprinted in 1980 U.S.C.C.A.N. 5019, 5023; H.R. COMM. PRINT NO. 96-

24

Our sister circuits have drawn upon the plain meaning of the word "contribute" and on the legislative history as well to interpret the "contributing to" phrase under the analogous § 6973 provision.[23]  See, e.g., Aceto, 872 F.2d at 1383 ("The relevant legislative history supports a broad, rather than a narrow, construction of the phrase 'contributed to.'"); United States v. Waste Indus., Inc., 734 F.2d 159, 167 (4th Cir. 1984) ("Congress's intent, then, was to establish a standard of liability by incorporating and expanding upon the common law."). The Court of Appeals for the Fourth Circuit aptly summarized

---

IFC 31, at 31 (1979).

    We note that this legislative history pertains to an analogous provision, § 6973, which details the requirements that must be met in order for the EPA (on behalf of the United States) to bring suit.  It contains language identical to the citizen suit provision of § 6972(a)(1)(B).  We apply the "normal rule of statutory construction that identical words used in different parts of the same act are intended to have the same meaning." Commissioner v. Lundy, 516 U.S. 235, 250 (1996) (internal quotations and citations omitted); cf. 2A N. SINGER, SUTHERLAND ON STATUTORY CONSTRUCTION § 46.07, at 202-04 (6th ed. 2000) ("Where one section of a statute contains a particular provision, omission of the same provision from a similar section is significant to show different legislative intent for the two section [sic].").

    In addition to this well-established rule of statutory construction, which is based on likely congressional intent, our conclusion that § 6972(a)(1)(B) and § 6973 are to be similarly interpreted is also supported by the evidence we have of congressional intent regarding the RCRA.  See H.R. REP. NO. 98-198, Part I, at 53 (1983), reprinted in 1984 U.S.C.C.A.N. 5576, 5612 (stating that private parties may sue under the citizen suit provision [of § 6972(a)(1)(B)] "pursuant to the standards of liability established under [§ 6973]").

    [23]  See supra note 22.

25

congressional intent regarding interpretations of phrases such as

"contributing to":

> [Congress has mandated] that the former common law of
> nuisance, as applied to situations in which a risk of
> harm from solid or hazardous wastes exists, shall
> include new terms and concepts which shall be developed
> in a liberal, not a restrictive, manner.  This ensures
> that problems that Congress could not have anticipated
> when passing the [RCRA] will be dealt with in a way
> minimizing the risk of harm to the environment and the
> public.

Waste Indus., 734 F.2d at 167. (citations omitted).[24]  Therefore,

we follow our sister circuits' lead and interpret "contribute" to

mean "have a part or share in producing an effect."


*b. The Required Level of Fault*

As to the fault standard under which such "contributions"

are held actionable, we note that the one circuit that has

addressed this specific issue has held that the RCRA imposes

strict liability, i.e., liability imposed without regard to the

---

[24]  The congressional statements are in accord with the
overriding objective of the RCRA:  "The [RCRA] is a multifaceted
approach toward solving the problems associated with the 3-4
billion tons of discarded materials generated each year, and the
problems resulting from the anticipated 8% annual increase in the
volume of such waste."  H.R. REP. No. 94-1491, Part I, at 2
(1976), reprinted in 1976 U.S.C.C.A.N. 6238, 6239.  "Congress
believed that by giving citizens themselves the power to enforce
[RCRA] provisions by suing violators directly, they could speed
compliance with environmental laws, as well as put pressure upon
a government that was unable or unwilling to enforce such laws
itself."  Greenpeace, Inc. v. Waste Techs. Indus., 9 F.3d 1174,
1179 n.2 (6th Cir. 1993) (citing H.R. REP. No. 98-198, Part I, at
53 (1983), reprinted in 1984 U.S.C.C.A.N. 5576, 5612); cf. Waste
Indus. 734 F.2d at 165 (stating that Congress expressly intended
the RCRA to "close loopholes in environmental protection").

defendant's negligence or intent to harm.  Cf. United States v. Northeastern Pharm. & Chem. Co., 810 F.2d 726, 741 (8th Cir. 1986) (stating, in a case arising under § 6973 (see supra note 22), that Congress intended to impose liability "without fault or negligence" and specifically on past non-negligent off-site generators and transporters); Aceto, 872 F.2d at 1377 (citing Northeastern and stating that § 6973 "has been interpreted to impose strict liability").[25]  Some other courts have also come to

_____

[25]  The City argues at one point that Aceto is inapposite because it deals primarily with the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9607, than the RCRA.  As to this rationale, we do not agree. Aceto considers both CERCLA and RCRA claims, clearly delineating between the two discussions.  See 872 F.2d at 1376, 1378, 1382.
        The City also asserts that the RCRA "is not directed to issues regarding liability for hazardous waste as [is CERCLA]," apparently to distinguish CERCLA cases.  First, we note that the distinction between the RCRA and CERCLA is not that the former deals with solid waste and the latter with hazardous waste. Rather, both statutes deal with both types of waste; the variation arises from the fact that the RCRA concerns existing dumps and the CERCLA deals with abandoned dumps.  See O'REILLY ET AL., RCRA AND SUPERFUND § 2.02, at 2-3 (stating that "CERCLA applies to abandoned sites, and RCRA deals with today's generators").
        We also do not find the City's implied argument (i.e., that solid and hazardous waste be treated differently) to be persuasive.  There is no such indication in § 6972(a)(1)(B).  To the contrary, the terms "solid or hazardous waste" in § 6972(a)(1)(B) indicate that both are to be treated similarly. If Congress had wished to treat solid waste differently under this provision, it could have done so, as it has done in other provisions.  See, e.g., 42 U.S.C. § 6922 (dealing only with "standards applicable to generators of hazardous waste"); § 6937 (describing an "inventory of Federal agency hazardous waste facilities").  We also note that the State discovered at least one drum at the Deepwood dump that appeared to contain hazardous waste.

the same conclusion.  See, e.g., Zands II, 797 F. Supp. at 809-10.

We have no reason to consider here whether strict liability may be a basis for liability under the RCRA.[26]  The district court did not hold the City strictly liable for the waste that it generated and that was deposited in the Deepwood and South Loop 12 dumps.  In the case of the South Loop 12 dump, the City did not dispute that it used the site as a municipal dump.  In the case of the Deepwood dump, the district court found, and we agree, that there is a compelling case on the record that the City's actions were negligent, i.e., that the City failed to exercise due care in selecting or instructing the entity actually conducting the disposal of the City's waste.[27]

---

[26]  That Congress intended for the RCRA to be a strict liability statute finds some support in the legislative history. See, e.g., H.R. CONF. REP. NO. 98-1133, at 119 (1984), reprinted in 1984 U.S.C.C.A.N. 5649, 5690 ("Therefore, [the RCRA] has always reached those persons who have contributed in the past or are presently contributing to the endangerment, including but not limited to generators, regardless of fault or negligence. . . . Thus for example, non-negligent generators whose wastes are no longer being deposited or dumped at a particular site may be ordered to abate the hazard to health or the environment posed by the leaking of the wastes they once generated and which have been deposited on the site."); H.R. COMM. PRINT NO. 96-IFC 31, at 31 (1979) ("For example, a company that generates hazardous waste would be someone 'contributing to' an endangerment . . . even where someone else deposited the waste in an improper disposal site (similar to strict liability under common law)."); H.R. REP. NO. 98-198, Part I, at 48 (1983), reprinted in 1984 U.S.C.C.A.N. 5576, 5607 ("[The RCRA] has always provided the authority to require the abatement of present conditions of endangerment resulting from past disposal practices, whether intentional or unintentional.").

[27]  There are also indications in the legislative history that Congress intended to create liability under a negligence

### c. The Evidence Regarding the Deepwood

### and South Loop 12 Dumps

We now examine the evidence regarding each dump and conclude that the district court did not commit clear error in finding that the evidence established § 6972(a)(1)(B) "contributing to" liability for the City.

### i. Deepwood Dump

The RCRA creates, at the very least, a duty on the part of generators not to dispose of their waste in such a manner that it may present an imminent and substantial endangerment to health or the environment. Negligent oversight of disposal is actionable under the RCRA.[28] See supra note 27 and accompanying text. As described supra in Part I.A, the City contracted with Billy Nabors and Dallas Demolition to conduct demolitions of City property. These City contractors dumped loads of debris at the

---

framework. See, e.g., S. REP. NO. 96-172, at 5 (1979), reprinted in 1980 U.S.C.C.A.N. 5019, 5023 ("For example, a company that generated hazardous waste might be someone contributing to an endangerment . . . even where someone else deposited the waste in an improper disposal site (similar to strict liability under common law), where the generator had knowledge of the illicit disposal or failed to exercise due care in selecting or instructing the entity actually conducting the disposal." (emphasis added)).

[28] The City appears to argue that holding it liable for the actions of its contractors in disposing of city waste is akin to strict liability. This assertion is wholly without merit. As we have noted and will explain, this meets a negligence standard, and we are not addressing here whether strict liability is appropriate under the RCRA.

Deepwood dump. The City's contracts with Dallas Demolition did not specify that waste materials generated by the City's activities must be properly disposed of in a legal landfill. The City was aware that Dallas Demolition engaged in illegal dumping and operated its own unauthorized waste site. Furthermore, the City's attorneys were informed that Dallas Demolition dumped at the Deepwood dump. However, even <u>after</u> the City's attorneys had learned that Dallas Demolition had been dumping illegally in Dallas, the City continued to work with Dallas Demolition.[29] The district court did not clearly err in finding that this "lax oversight" of its contractors and their disposal of City waste is evidence of the City's "contributing to" liability. <u>Cf.</u> <u>Blue Legs v. U.S. Bureau of Indian Affairs</u>, 867 F.2d 1094, 1099 (8th Cir. 1989) (finding that federal government agencies "contributed to" open dumping by "generating solid waste, contracting for its disposal and, in <u>some</u> instances, transporting solid waste to dumps operated in violation of federal law" (emphasis added)).

The City argues that there is no evidence in the record that the City's waste actually went into the Deepwood dump. The City

---

[29] The City asserts that it had no knowledge that its contractors were illegally dumping at the Deepwood dump. On the record, the district court did not clearly err in finding that the City's attorneys were aware of the contractors' illegal actions. In addition, we note that, under negligence, it is not required that the City actually "know." Rather, it is sufficient that the City reasonably should have known.

asserts, instead, that the contracts simply demonstrate that it could have used Billy Nabors or Dallas Demolition to haul trash, but that there is no evidence that it actually did do so (and, even if it did utilize these haulers, that the City's particular waste was taken to the Deepwood dump). We find little merit in this argument.

First, the district court reasonably inferred that the City's waste went into the Deepwood dump, and on this record, this inference is not clear error. The City Council allocated funds for the demolition actions, and the City Council, subsequent to a bidding process, awarded specific contracts to Dallas Demolition and Billy Nabors, even after City attorneys knew that they were dumping illegally at the Deepwood dump. Given that the City specifically hired these contractors to perform certain jobs, a logical conclusion is that the City used them for those jobs. A mere assertion from the City that the jobs might not have been performed is insufficient to alter this conclusion.

The City's actions therefore snugly fit the "failed to exercise due care in selecting or instructing the entity actually conducting the disposal" statement from S. REP. NO. 96-172, at 5 (1979), reprinted in 1980 U.S.C.C.A.N. 5019, 5023. See supra Part III.B.2.b.[30] This situation also closely parallels an

---

[30] There may also be other bases for § 6972(a)(1)(B) liability, but we need not decide that in the instant case.

31

example considered in a 1979 House Committee Report and a 1979 Senate Report, i.e., that a generator of solid waste is subject to liability even when someone else conducted the disposal at the generator's request. See S. REP. NO. 96-172, at 5 (1979), reprinted in 1980 U.S.C.C.A.N. 5019, 5023; H.R. COMM. PRINT NO. 96-IFC 31, at 31 (1979).

Therefore, the district court did not err in assessing § 6972(a)(1)(B) liability against the City based on the City's negligent actions regarding the disposal of its waste.[31]

### ii. South Loop 12 Dump

The City does not dispute that it used the South Loop 12 site as a municipal landfill from 1964 until at least 1972. An owner of South Loop 12 fenced the site and hired a guard to stop

---

[31] The district court also based § 6972(a)(1)(B) liability on the City's actions in granting permits for filling and mining operations at the Deepwood dump after the City had obtained a judgment (which had not been complied with) against the owner of the Deepwood dump finding the site to be an illegal open dump and requiring the abatement of the conditions at the site. See supra Part I.A. The district court found, in addition, that in issuing those permits, the City "had numerous opportunities to minimize the health hazard that exists next door to the Plaintiffs' homes by simply following its own procedures," opportunities which the City did not avail itself of.

The district court held, and we agree, that the City's liability may be based on its generation and subsequent disposal of solid waste, wholly apart from the City's permitting actions. We therefore need not and do not address whether the City's permitting activities could also be a basis for § 6972(a)(1)(B) liability. We note that the City does not argue that negligent actions in issuing permits could not, as a matter of law, form a basis for § 6972(a)(1)(B) liability, but instead appears to assert that its actions as to the permits were not negligent.

the City from dumping because the City would not properly cover the refuse it had dumped there.[32]  The City's primary argument is that because its use ended in 1972 and because the RCRA was not enacted until 1976, it cannot be held liable under § 6972(a)(1)(B).  We do not agree.

Section 6972(a)(1)(B) is clear that it applies to <u>both</u> past and present acts, as the adjectives "past and present" are specifically included.  We have also previously confirmed that "[w]e understand [the] language [of § 6972(a)(1)(B)] to provide a claim for injunctive relief based on either <u>past or present</u> conduct."  <u>Tanglewood E. Homeowners v. Charles-Thomas, Inc.</u>, 849 F.2d 1568, 1576 (5th Cir. 1988) (emphasis added) (the activities at issue in the case had also occurred before 1976); <u>Northeastern</u>, 810 F.2d at 739 (stating that the analogous provision of § 6973, <u>see</u> <u>supra</u> note 22, "specifically applies to <u>past</u> generators and transporters" and rejecting the defendant's argument that pre-1976 dumping should not be a basis for RCRA liability); <u>see also</u> <u>infra</u> Part III.B.3 (explaining that although the endangerment must currently exist, the actions causing the endangerment may have occurred wholly in the past); <u>cf.</u> <u>Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.</u>, 484 U.S. 49,

---

[32]  This directly contradicts the City's assertion that there is no evidence in the record that it did not fulfill its requirement of placing at least eighteen inches of compact soil over the waste (a condition of using the site as a sanitary landfill).

33

57 & n.2 (1987) (noting that Congress intentionally used "language that explicitly targets wholly past violations" when it created § 6972(a)(1)(B)).

"In short, the disposal of wastes [as wholly past acts] can constitute a continuing violation as long as no proper disposal procedures are put into effect or as long as the waste has not been cleaned up and the environmental effects remain remediable." Gache v. Town of Harrison, 813 F. Supp. 1037, 1041, 1042 (S.D.N.Y. 1993) (rejecting the defendant city's argument that it had not dumped any materials in years and thus should not be held liable); United States v. Price, 523 F. Supp. 1055, 1071 (D.N.J. 1981) (rejecting defendants' argument that the RCRA could not be applied to its activities, which ceased in 1972), aff'd, 688 F.2d 204 (3d Cir. 1982).  The continued presence of this municipal waste in the South Loop 12 dump (so long as it presents an imminent and substantial endangerment to health or the environment, see infra Part III.B.3) is actionable under § 6972(a)(1)(B).

### 3. Imminent and Substantial Endangerment
### to Health or Environment

Lastly, the district court did not err in concluding that an imminent and substantial endangerment to health or the environment existed at both dumps.  At the outset, we note that the operative word in § 6972(a)(1)(B) is "may."  Thus, Plaintiffs

must demonstrate that the waste "may present" such a danger.[33]
See Daque v. City of Burlington, 935 F.2d 1343, 1355 (2d Cir.
1991) ("Significantly, congress used the word 'may' to preface
the standard of liability[.]"), rev'd in part on other grounds,
502 U.S. 1071 (1992); Kara Holding Corp. v. Getty Petroleum
Mktg., Inc., 67 F. Supp. 2d 302, 310 (S.D.N.Y. 1999) (emphasizing
"may" in § 6972(a)(1)(B)); cf. Greenpeace, Inc. v. Waste Techs.
Indus., 9 F.3d 1174, 1181 (6th Cir. 1993) (contrasting the
"difficult standards of § 6976(b)" with the "far less restrictive
rules governing [imminent and substantial endangerment under]
§ 6972(a)(1)(B)").

The Supreme Court has also pointed out that the phrase "may
present" communicates another idea:  It "quite clearly excludes
waste that no longer presents" the harm contemplated by
§ 6972(a)(1)(B).  See Meghrig, 516 U.S. at 486.  "[T]his language
'implies that there must be a threat which is present now,
although the impact of the threat may not be felt until later.'"
Id. (quoting Price v. U.S. Navy, 39 F.3d 1011, 1019 (9th Cir.
1994)).  As such, "under an imminent hazard citizen suit, the
endangerment must be ongoing, but the conduct that created the
endangerment need not be."  Conn. Coastal Fishermen's Ass'n v.

---

[33]  As will be explained infra in the text, Plaintiffs'
evidence not only illustrates that the waste at each dump "may
present" an "imminent and substantial endangerment," but also
that it already does present such a danger to health and the
environment.  See infra Parts III.B.3.a & b.

Remington Arms Co., Inc., 989 F.2d 1305, 1316 (2d Cir. 1993); see also U.S. Navy, 39 F.3d at 1019 (stating that the language of the provision does not require actual harm, but threatened or potential harm); United States v. Waste Indus., Inc., 734 F.2d 159, 165 (4th Cir. 1984) (stating that the RCRA was intended to apply to "active human conduct" and is "a means to respond to disasters precipitated by earlier poor planning" (emphasis added)).

Because the RCRA does not define "imminent," the Supreme Court, as is its customary practice, see supra Part III.B.2.a (discussing meaning of "contribute"), looked to the plain meaning of the term:  "An endangerment can only be 'imminent' if it 'threaten[s] to occur immediately.'"  Meghrig, 516 U.S. at 485 (alteration in original) (quoting WEBSTER'S NEW INTERNATIONAL DICTIONARY OF ENGLISH LANGUAGE 1245 (2d ed. 1934)); see also Daque, 935 F.2d at 1356 ("A finding of 'imminency' does not require a showing that actual harm will occur immediately so long as the risk of threatened harm is present[.]"); United States v. Price, 688 F.2d 204, 213-14 (3d Cir. 1982); Kara Holding, 67 F. Supp. 2d at 310 (citing Meghrig); cf. Envtl. Def. Fund v. EPA, 465 F.2d 528, 535 (D.C. Cir. 1972) ("An 'imminent hazard' may be declared at any point in a chain of events which may ultimately result in harm to the public." (internal quotations and citation omitted)).  The legislative history supports interpreting "imminent" in accordance with this plain meaning:

36

> Imminence . . . applies to the nature of the threat rather than identification of the time when the endangerment initially arose. The section, therefore, may be used for events which took place at some time in the past but which continue to present a threat to the public health or the environment.

H.R. COMM. PRINT NO. 96-IFC 31, at 32 (1979). And finally, an endangerment is "substantial" if it is "serious." See U.S. Navy, 39 F.3d at 1019.

With this framework in place, we now examine the evidence regarding the imminent and substantial endangerment to health and the environment at each dump.

### a. Deepwood Dump

The district court did not clearly err in concluding that the Deepwood dump "may present an imminent and substantial endangerment to health or the environment."[34] See supra Part I.A. The evidence includes the following: The Deepwood dump is adjacent to residences and is partially in the flood plain of the Trinity River; the dump is easily accessible to children; the Deepwood dump twice caught fire and burned, with the resulting fumes polluting the neighborhood air; a significant fire hazard continues to exist at the dump; the State's reports reveal that

---

[34] On appeal, the City does not strenuously assert that the conditions at the Deepwood dump do not pose an "imminent and substantial endangerment to health or the environment." At one point, the City does conclusorily state that there is no evidence to support the district court's finding in this regard. As demonstrated infra in the text, there is ample evidence in the record, including the City's own admissions, that the Deepwood dump constitutes such an endangerment.

there is an imminent threat of the discharge of municipal solid waste into Elam Creek, a tributary of the Trinity River, because of the massive illegal dumping; the State itself has noted that waste at the Deepwood dump may cause contamination of surface water and ground water through the leaching of contaminates from the debris by rainwater; asbestos, benzo(a)athracene, and benzene (in excess of state limits) have been detected at the Deepwood dump; and the City itself has long maintained that the Deepwood dump poses a hazard to the public health.

### b. South Loop 12 Dump

On appeal, the City argues that the material it dumped at the South Loop 12 dump presents no danger to health or the environment; yet, the City points to nothing in the record to support this assertion. The district court concluded that Plaintiffs have adequately demonstrated that the City's contributions played a role in the creation of the dangers at the South Loop 12 dump, and, as will be explained below, the record well supports this conclusion.[35]

---

[35] The City asserts further that the district court's conclusion that there is a danger of fires is not supported by the record. The City points out that some of the exhibits upon which the district court relied give a "no" answer to the question whether solid waste burned at the dump. Other exhibits answer the same question with "unknown." The court's finding of a danger of fires in the future is not rendered clearly erroneous by some evidence that solid waste at the dump had not burned in the past. On this record, the court did not clearly err in finding that an imminent and substantial endangerment to health and the environment exists at the South Loop 12 dump. See infra text.

The district court did not clearly err in finding that the South Loop 12 dump satisfies the endangerment standard of § 6972(a)(1)(B). First, as the district court noted, the City itself had previously admitted that the South Loop 12 dump was a "hazard to the public health in its present condition." Furthermore, the City's state court judgment against the owners stated that the judgment was "necessary for the maintenance of the public health and environment."

In addition, the State's documents themselves describe the very danger of old landfills, like the South Loop 12 dump, that were established before any of the proper closure requirements were in place: As the old waste decomposes, the cover soil can settle, ground and surface water can become contaminated with leachate, and dangerous gases can form and migrate underground.[36] This meets the "may present an imminent and substantial endangerment" standard. Moreover, as the City failed to adhere even to the less stringent requirements in effect during the time it was dumping at the South Loop 12 dump, the dangers described in the State's plan are even more likely to materialize.

---

[36] These dangers, stemming from old waste, are also applicable to the Deepwood dump.

Therefore, the district court's finding that the City was liable under § 6972(a)(1)(B) for the Deepwood and South Loop 12 dumps was not clearly erroneous.[37]

---

[37] Although the City contests its liability under § 6972(a)(1)(B) for both dumps, it has never argued in the alternative that, even if it were to be held liable, it is not responsible for the cleanup in toto.  At oral argument, the City stated for the first time that it had determined that over eight million cubic yards of waste existed at the dumps (as opposed to the two million figure utilized throughout the case).  In response to a question from the panel, the City's counsel acknowledged that this issue was not raised before the district court, was not briefed on appeal, and was being raised for the first time at oral argument.  As such, this issue is not properly before us.  See Hormel v. Helvering, 312 U.S. 552, 556 (1941) ("Ordinarily an appellate court does not give consideration to issues not raised below."); Stewart Glass & Mirror, Inc. v. U.S. Auto Glass Disc. Ctrs., Inc., 200 F.3d 307, 316-17 (5th Cir. 2000) ("It is a bedrock principle of appellate review that claims raised for the first time on appeal will not be considered."); Trust Co. v. N.N.P. Inc., 104 F.3d 1478, 1485 (5th Cir. 1997) (stating that "'contentions not briefed are waived and will not be considered on appeal'" (quoting Zeno v. Great Atl. & Pac. Tea Co., 803 F.2d 178, 180 (5th Cir. 1986))).

Moreover, the point itself is elusive.  Other than the alleged fact of the existence of eight million cubic yards of waste at the dumps, there was no suggestion in oral argument that the City has any legal basis for diminishing its responsibility for the remedy.  We note that several courts have found that the RCRA imposes joint and several liability.  See, e.g., Waste, Inc. Cost Recovery Group v. Allis Chalmers Corp., 51 F. Supp. 2d 936, 941 (N.D. Ind. 1999); Aurora Nat'l Bank v. Tri Star Mktg., Inc., 990 F. Supp. 1020, 1034 (N.D. Ill. 1998); United States v. Valentine, 856 F. Supp. 627, 633-34 (D. Wyo. 1994); United States v. Conservation Chem. Co., 619 F. Supp. 162, 199 (W.D. Mo. 1985) (discussing in detail the reasons underlying joint and several liability in RCRA violations); Lincoln Props., Ltd. v. Higgins, CIV. No. S-91-760DFL/GGH, 1993 WL 217429, at *15 (E.D. Cal. Jan. 21, 1993); see also infra Part IV.B.1 (discussing, with regard to redressability in the standing inquiry, the broad authority of courts to grant equitable relief under the RCRA).  Under this familiar doctrine, when two or more persons cause an indivisible harm, each is subject to liability for the entire harm.  See, e.g., RESTATEMENT (THIRD) OF TORTS: APPORTIONMENT OF LIABILITY §§ 10, A18 (2000 & Supp. 2001); DOBBS, LAW OF TORTS 1077, 1091 (2001); PROSSER,

# IV. PLAINTIFFS' APPEAL

The district court dismissed Saitas from the case, finding that Plaintiffs had not met their burden as to any of their claims against Saitas. On appeal, Plaintiffs contend that they did meet their burden as to their claims that Saitas violated specific regulations, requirements, and standards that took effect pursuant to the solid waste disposal provisions of the RCRA.[38] They argue that these provisions require Saitas to inventory all landfills in the state, to classify those that do not meet EPA standards for sanitary landfills as open dumps, to achieve either the closing of the dumps (such that they are in compliance with EPA standards) or the upgrading of the dumps to sanitary landfill status, to eliminate the health hazards of the dumps, and to take steps to prevent future health hazards. See

---

LAW OF TORTS 328, 347 (1984 & Supp. 1988); see also, e.g., Aurora Nat'l Bank v. Tri Star Mktg., Inc., 990 F. Supp. 1020, 1034 (N.D. Ill. 1998). If, however, the defendant can demonstrate that the harm is divisible and if there is a reasonable basis for the apportionment, the defendant is responsible for its own contribution to the harm. See, e.g., RESTATEMENT (THIRD) OF TORTS at § 26; DOBBS, LAW OF TORTS at 423; PROSSER, LAW OF TORTS at 348-52; see also, e.g., Aurora, 990 F. Supp. at 1034. However, the City made no claim, even at oral argument, that this doctrine (or any other) could provide a legal basis for reducing its responsibility for the remedy.

[38] In the district court, Plaintiffs had also claimed that Saitas "contributed or is contributing" to the handling, storage, treatment, transportation, or disposal of solid or hazardous waste at the Deepwood and South Loop 12 dumps, in violation of 42 U.S.C. § 6972(a)(1)(B), and that Saitas engaged in solid waste management practices in violation of 42 U.S.C. § 6945(a). Plaintiffs do not appeal the dismissal of these claims.

42 U.S.C. §§ 6943(a)(2) & (3), 6944, 6945, 6947; 40 C.F.R. § 256.23(a), (c), (d). Plaintiffs seek to enforce these obligations via the citizen suit provision in 42 U.S.C. § 6972(a)(1)(A).

Before we address Saitas's arguments with respect to the threshold issues of standing and Eleventh Amendment immunity, and in order to provide context for these arguments, we pause here to lay out the relevant statutory and regulatory background. We then continue with our analysis.

### A. Statutory and Regulatory Framework

Under the RCRA, states are able to receive federal financial and other assistance if they comply with various RCRA provisions and the corresponding EPA regulations. One such requirement is that states must submit solid waste management plans that "prohibit the establishment of new open dumps within the State," and ensure that solid waste will be "utilized for resources recovery or . . . disposed of in sanitary landfills . . . or otherwise disposed of in an environmentally sound manner." 42 U.S.C. § 6943(a)(2). Further, the plan must "provide for the closing or upgrading of all existing open dumps within the State pursuant to the requirements of section 6945." Id. § 6943(a)(3). Along these lines, a state is to provide the EPA with a list of open dumps in the state, which the EPA must publish in the ODI. See 42 U.S.C. § 6945(b); 40 C.F.R. pt. 256. The ODI was meant "[t]o assist the States in complying with section 6943(a)(3)."

42

42 U.S.C. § 6945(b).  Section 6945(a) in turn specifies that the state plan must "contain a requirement that all existing disposal facilities or sites for solid waste in [the] State which are open dumps listed in the [ODI] . . . shall comply with such measures as may be promulgated by the Administrator to eliminate health hazards and minimize potential health hazards."  Id. § 6945(a).

These regulations, promulgated by the EPA, provided "guidelines for the development and implementation of State solid waste management plans."  Guidelines for Development and Implementation of State Solid Waste Management Plans, 44 Fed. Reg. 45066, 45066 (July 31, 1979).  States were required to classify existing solid waste disposal facilities, with the open dumps to be published in the ODI.  See 40 C.F.R. § 256.23(a). "[A]ny facility which fails to comply with any one element of the 'Criteria for Classification of Solid Waste Disposal Facilities and Practices' . . . is an open dump."  Solid Waste Disposal; Inventory of Open Dumps, 50 Fed. Reg. 41952, 41952 (Oct. 16, 1985) (explaining that facilities that did not satisfy the sanitary landfill criteria and which were not facilities for the disposal of hazardous waste were to be classified as open dumps). "For each facility classified as an open dump the State shall take steps to close or upgrade the facility."  40 C.F.R. § 256.23(c).  In addition, while "providing for the closure of open dumps the State shall take steps necessary to eliminate

43

health hazards and minimize potential health hazards."  Id. § 256.23(d).

In accordance with these statutory and regulatory requirements, the State of Texas submitted its Solid Waste Management Plan ("the state plan"), which was subsequently approved by the EPA.  See Approval of Texas Solid Waste Management Plan, 48 Fed. Reg. 3986, 3986 (Jan. 28, 1983).  The district court found that the State "adopted a strategy of only listing on the ODI those sites that had previously received a permit" from the State.  The district court further found that because most dumps do not apply for a state permit, "this strategy greatly reduced the number of existing open dumps in Texas that could potentially find their way onto the ODI."  The court went on to state in its Findings of Fact and Conclusions of Law that the State "never informed the EPA of its intent to unilaterally narrow the scope of the ODI."[39]

### B. Standing and Eleventh Amendment Immunity

On appeal, Saitas puts forth various jurisdictional issues and argues that, even if the merits were to be reached, he did not violate the RCRA.  We examine each of the threshold issues in turn.  Not finding them to be viable in the instant case, we then examine the merits of Plaintiffs' claims, concluding that the district court did not err in finding in favor of Saitas.

---

[39]  The district court also found that the dumps that the State did list on the ODI were subsequently upgraded to meet the EPA's sanitary landfill criteria.

44

Saitas asserts that Plaintiffs lack standing and also that he is immune from suit under the Eleventh Amendment.[40]  Standing is a jurisdictional doctrine that the Supreme Court has held must be decided before the merits of a case.  See Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 93-102 (1998) (rejecting the doctrine of "hypothetical jurisdiction"); see also Schlesinger v. Reservists Comm. to Stop the War, 418 U.S. 208, 215 (1974) (stating that "the concept of justiciability, which expresses the jurisdictional limitations imposed upon federal courts by the 'case or controversy' requirement of Art. III, embodies . . . [among other doctrines] the standing doctrine[]").  "While the Eleventh Amendment is jurisdictional in the sense that it is a limitation on the federal court's judicial power, . . . [the Supreme Court has] recognized that it is not coextensive with the limitations on judicial power in Article III."  Calderon v. Ashmus, 523 U.S. 740, 745 n.2 (1998); Laje v. R. E. Thomason Gen. Hosp., 665 F.2d 724, 726 n.2 (5th Cir. 1982) (stating that Eleventh Amendment claims "are jurisdictional in nature" (emphasis added)).  The Supreme Court has also stated that standing must be examined before the Eleventh Amendment.  See

---

[40]  In the district court and on appeal, Saitas also asserts the diligent prosecution defense.  This is a statutory defense, arising from the RCRA itself.  See 42 U.S.C. § 6972(b)(1)(B).  Because the diligent prosecution defense is not jurisdictional and because we find that Saitas ultimately prevails on the merits, see infra Part IV.C, we do not address Saitas's arguments in this regard.

45

<u>Calderon</u>, 523 U.S. at 745 (stating that the Court "<u>must</u> first address whether [the action] is the sort of 'Article III' 'case or controversy' to which federal courts are limited").

### 1. Standing

Article III, § 2 of the Constitution "extends the 'judicial Power' of the United States only to 'Cases' and 'Controversies.'" <u>Steel Co.</u>, 523 U.S. at 102. "That a suit may be a class action . . . adds nothing to the question of standing, for even named plaintiffs who represent a class must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent." <u>Lewis v. Casey</u>, 518 U.S. 343, 357 (1996) (alteration in original) (internal quotations omitted) (quoting <u>Simon v. Eastern Ky. Welfare Rights Org.</u>, 426 U.S. 26, 40, n. 20 (1976)). A plaintiff must demonstrate that he or she satisfies the three constitutional requirements of standing: (1) injury in fact, (2) causation, and (3) redressability. <u>See</u> <u>Bennett v. Spear</u>, 520 U.S. 154, 167 (1997); <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 560-61 (1992).

A plaintiff suffers injury in fact when there has been "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." <u>Lujan</u>, 504 U.S. at 560 (internal quotations and citations omitted). The causation requirement is met when the injury is such that it is "'fairly . . . trace[able] to the

46

challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court.'" Id. at 560-61 (alterations in original) (quoting Simon v. Eastern Ky. Welfare Rights Org., 426 U.S. 26, 41-42 (1976)). As for redressability, it must be "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." Id. at 561 (internal quotations and citation omitted).

On appeal,[41] Saitas does not appear to argue that Plaintiffs have not suffered an injury in fact or that they fail to demonstrate causation.[42] Rather, Saitas focuses his challenge on the redressability requirement. Saitas argues that an injunctive order requiring him to classify the Deepwood and South Loop 12 sites as "open dumps," and to formally submit the names of those sites to the EPA for inclusion on the ODI, will not remedy the problem posed by the illegal dumps because there is no

---

[41] Saitas also asserted this defense in the district court, but the court did not address it, choosing rather to decide on the merits. The district court based its judgment that Saitas be dismissed from the suit on Plaintiffs' inability to carry their burden on the claims.

[42] Because standing is a jurisdictional doctrine, we nevertheless must insure that the injury-in-fact and causation elements are satisfied.

correlation between classification and enforcement.[43]  Saitas

analogizes the instant case to <u>Steel Co.</u>

Plaintiffs acknowledge that if they were seeking only to

have the dumps classified as open dumps and listed on the ODI,

then standing could be problematic, as in <u>Steel Co.</u>  However,

they interpret the RCRA not only to require Saitas to classify

Deepwood and South Loop 12 as open dumps and submit them for the

ODI, but also to require Saitas either to upgrade or to close the

dumps.  Thus, Plaintiffs assert that their requested relief goes

beyond merely listing the Deepwood and South Loop 12 dumps on the

ODI, noting that they strove to obtain an injunction that would

also require Saitas to take steps to close the dumps or upgrade

them to federal standards and to take the steps necessary to

---

[43]  Saitas also points out that the EPA has not given
planning grants for the ODI since fiscal year 1981 and that the
ODI was last published in 1985.  We agree with the district court
that this fact does not dispose of Plaintiffs' claims:

> The provision of the Texas Administrative Code that
> grants Saitas the authority to evaluate sites to
> determine whether to place them on the ODI, 30 TEX.
> ADMIN. CODE § 335.304 (West 1998), became effective May
> 28, 1986.  The fact that Saitas was granted this
> authority after 1985 runs directly counter to his
> argument that the statutory provisions relating to the
> ODI were no longer in effect after 1985, the date of
> the last published ODI.

<u>See also</u> Guidelines for Development and Implementation of State
Solid Waste Management Plans and Criteria for Identification of
Solid Waste Disposal Facilities and Practices, 46 Fed. Reg.
47048, 47048 (Sept. 23, 1981) (EPA stating that, although future
funds have not been allocated, it "remain[s] ready . . . to
perform its statutory duty under Section 4007 to take action to
approve or disapprove plans submitted by the States").

eliminate the existing health hazards and to minimize potential health hazards.  We agree with Plaintiffs that they have standing.

First, Plaintiffs have amply demonstrated an injury in fact. At least two-million cubic yards of waste, approximately forty-feet deep, are present at the Deepwood dump, which is adjacent to Plaintiffs' residential neighborhoods.  Residents close to the dumps report the appearance of snakes and rats in their backyards since the beginning of the illegal dumping.  Asbestos and benzo(a)athracene have been detected at the Deepwood dump, and benzene has been discovered in excess of state limits.  The Deepwood dump has caught fire and burned several times, and a significant fire hazard still exists at the dump.  Solid waste continues to be dumped on the South Loop 12 site, with the State discovering during a 1991 inspection that the area of the waste along the alley behind the homes has been expanding.  The City and State themselves have acknowledged that both dumps constitute a hazard to the public health.  These facts, among others, demonstrate a concrete, actual injury and thus satisfy the first standing requirement.

Next, we find that Plaintiffs have demonstrated causation. The district court found that because most dumps do not apply for a state permit, the State's strategy of listing only previously permitted sites on the ODI "greatly reduced the number of existing open dumps in Texas that could potentially find their

49

way onto the ODI." The court also found that all of the dumps that the State did list on the ODI were subsequently upgraded to meet the EPA's sanitary landfill criteria. From our review of the record, we find that the district court did not err in making these findings. Therefore, it can be said that Plaintiffs' injury is "fairly traceable" to the actions of Saitas as it is likely that conditions at the Deepwood and South Loop 12 dumps would have been ameliorated if Saitas had acted to set the process in motion. Had the Deepwood and South Loop 12 dumps been placed on the ODI (which, Plaintiffs contend, is required by the RCRA[44]), Saitas would have been obligated to plan for and implement the closing or upgrading of the dumps under 40 C.F.R. § 256.23.

We also agree with Plaintiffs that Steel Co. is inapposite to the instant case and find that they have satisfied the redressability requirement as well. In Steel Co., a citizens group sought declaratory judgment that the defendant violated the Emergency Planning and Community Right to Know Act (the "EPCRA"), 42 U.S.C. § 11046(a)(1), by failing to file timely annual

---

[44] As described earlier in this section, Plaintiffs have a colorable claim under their interpretation of the RCRA. See Steel Co., 523 U.S. at 96 (stating that standing, which is jurisdictional, "is not defeated . . . by the possibility that the . . . petitioners [may not recover,]" i.e., that "'the right of the petitioners to recover under their complaint will be sustained if the . . . [law is] given one interpretation and will be defeated if [it is] given another'" (quoting Bell v. Hood, 327 U.S. 678, 682, 685 (1946))).

50

emergency and hazardous chemical inventory forms.  See Steel Co.,

523 U.S. at 86-88.  Unlike the instant case, the Steel Co.

defendant filed all of the overdue reports with the relevant

agencies after receiving notice from the plaintiff that it was in

violation of the EPCRA (even before the civil suit was filed).

See id. at 88.  The Supreme Court itself subsequently noted this

very distinction in Friends of the Earth, Inc. v. Laidlaw

Environmental Services (TOC), Inc., 528 U.S. 167 (2000).  The

Court stated:

> We specifically noted in [Steel Co.] that there was no
> allegation in the complaint of any continuing or
> imminent violation, and that no basis for such an
> allegation appeared to exist.  In short, Steel Co. held
> that private plaintiffs, unlike the Federal Government,
> may not sue to assess penalties for wholly past
> violations, but our decision in that case did not reach
> the issue of standing to seek penalties for violations
> that are ongoing at the time of the complaint and that
> could continue into the future if undeterred.

Id. at 187-88 (internal citations omitted); see also 13 CHARLES

ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 3531.10,

at 868 (Supp. 2000) ("Many aspects of the [ruling in Steel Co.]

rested on the conclusion that the plaintiff could not achieve

standing by seeking remedies that would advance the public

interest in deterring future violations or punishing past

violations.").

In this case, Saitas did not act to classify properly the

Deepwood and South Loop 12 sites as open dumps and then execute

the resulting upgrade/closure process after being informed by

Plaintiffs of alleged violations of federal law (as the <u>Steel Co.</u> defendant had done).  Plaintiffs have alleged longstanding and uncorrected violations of Saitas's obligations to plan for and accomplish the elimination of the hazards caused by the dumps. Thus, an injunction requiring Saitas to upgrade or close the dumps would redress the hazards created by those dumps.[45]  See <u>Meghrig</u>, 516 U.S. at 484 (stating that "a private citizen suing under § 6972(a)(1)(B) could seek a mandatory injunction, i.e., one that orders a responsible party to 'take action' by attending to the cleanup and proper disposal of toxic waste, or a prohibitory injunction, i.e., one that 'restrains' a responsible party from further violating [the] RCRA"); <u>Sealy Conn., Inc. v. Litton Indus., Inc.</u>, 989 F. Supp. 120, 124 (D. Conn. 1997) (stating that "mandatory injunctions are authorized by § 6972(a)(1)(B)" for attending to the cleanup and proper disposal of toxic waste); <u>cf.</u> <u>United States v. Price</u>, 688 F.2d 204, 214 (3d Cir. 1982) (stating that § 6973, <u>see</u> <u>supra</u> note 22,

---

[45]  Therefore, Saitas's assertions that merely requiring him to place the Deepwood and South Loop 12 dumps on the ODI would be ineffectual are unavailing; Saitas mischaracterizes the relief sought by Plaintiffs and also fails to recognize that once those dumps appear on the ODI, the upgrade/closure requirements are triggered under the regulations.  We also note that even if all that Plaintiffs were seeking to vindicate were procedural rights, we have previously stated:  "[T]he Supreme Court has counseled that, in a procedural rights case . . ., a plaintiff is not held to the normal standards for redressability and immediacy." <u>Sierra Club v. Peterson</u>, 185 F.3d 349, 360 (5th Cir. 1999) (citing <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 573 n.7 (1992)); <u>see also</u> <u>Sierra Club v. Glickman</u>, 156 F.3d 606, 613 (5th Cir. 1998).

"authorizes the cleanup of a site, even a dormant one, if that action is necessary to abate a present threat to the public health or the environment"); United States v. Valentine, 856 F. Supp. 627, 633 (D. Wyo. 1994) (stating that "[i]t is plain . . . that [§ 6973, see supra note 22,] empowers [a court] to grant the full range of equitable remedies and also all remedies traditionally provided under the common law of nuisance, at least so long as such relief serves to protect the public health and environment").

## 2. The Eleventh Amendment

Saitas argues on appeal[46] that he is protected from suit by the Eleventh Amendment and that the suit cannot be maintained under Ex parte Young, 209 U.S. 123 (1908). The Eleventh Amendment states: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. CONST. amend. XI. "Although by its terms the Amendment applies only to suits against a State by citizens of another State, . . . the Amendment's applicability [has been extended] to suits by citizens against their own States." Bd. of Trustees of the Univ. of Ala. v. Garrett, 121 S. Ct. 955, 962 (2001).

---

[46]  See supra note 41.

53

Because Plaintiffs have sued a state official in his official capacity, we address whether the doctrine of Ex parte Young operates in this case. As will be explained below, we find that Plaintiffs' suit for prospective injunctive relief under the RCRA may proceed against the individual state official sued in his official capacity, Jeffrey A. Saitas, Executive Director of the TNRCC.[47]

*Ex parte Young*

Ex parte Young held that the Eleventh Amendment does not bar a suit against a state official who is alleged to be acting in violation of federal law. See 209 U.S. 123, 159-60 (1908); see also Garrett, 121 S. Ct. at 968 n.9; Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 102-03 (1984); Edelman v. Jordan, 415 U.S. 651, 667-69 (1974); AT&T Communications v. Bellsouth Telecomms. Inc., 238 F.3d 636, 647 (5th Cir. 2001); Earles v. State Bd. of Certified Pub. Accountants, 139 F.3d 1033, 1039 (5th Cir. 1998). The Ex parte Young doctrine is premised on the concept that a state cannot authorize its officials to violate the Constitution and laws of the United States. See Ex parte Young, 209 U.S. at 160 ("The State has no power to impart to [the state officer] any immunity from responsibility to the supreme authority of the United States."). The Supreme Court's "decisions repeatedly have emphasized that the [Ex parte] Young

---

[47]  See supra note 5.

54

doctrine rests on the need to promote the vindication of federal rights." Pennhurst, 465 U.S. at 105.

In this case, we find that Plaintiffs' claims against Saitas are within the ambit of Ex parte Young. First, having sued Saitas in his official capacity, Plaintiffs are seeking prospective injunctive relief,[48] as opposed to retrospective relief. See Edelman, 415 U.S. at 667-69 (rejecting an injunction ordering retroactive payment of previously owed monetary benefits). "The distinction between that relief permissible under the doctrine of Ex parte Young and that found barred in Edelman was the difference between prospective relief on one hand and retrospective relief on the other." Quern v. Jordan, 440 U.S. 332, 337 (1979).

Second, Plaintiffs are also alleging violations of federal law, specifically the RCRA, and not state law. The regulations, requirements, and standards that Plaintiffs seek to enforce pursuant to 42 U.S.C. § 6972(a)(1)(A) are federal statutory and regulatory provisions: 42 U.S.C. §§ 6943(a)(2) & (3), 6944; 40 C.F.R. § 256.23(a), (c), & (d). Although the state plan provides

---

[48] Plaintiffs request injunctions requiring Saitas to classify the Deepwood and South Loop 12 sites appropriately as open dumps and then either to upgrade or close the dumps such that the health hazards are eliminated or minimized. See Edelman, 415 U.S. at 667-68 ("[T]he fiscal consequences to state treasuries in these [injunctive relief] cases were the necessary result of compliance with decrees which by their terms were prospective in nature. . . . Such an ancillary effect on the state treasury is a permissible and often inevitable consequence of the principle announced in Ex parte Young.").

55

that the State will comply with these federal provisions, Plaintiffs are not seeking to enforce the plan itself and therefore do not run afoul of Pennhurst's admonition regarding state law claims. See Pennhurst, 465 U.S. at 106 (concluding that "[Ex parte] Young and Edelman are inapplicable in a suit against state officials on the basis of state law"); Earles, 139 F.3d at 1039-40.

Saitas does not appear to contest that Plaintiffs are seeking prospective injunctive relief for violations of federal law. Rather, Saitas argues that state officers cannot be sued to enforce federal statutes that contain comprehensive enforcement mechanisms. Saitas focuses on Seminole Tribe of Florida v. Florida, 517 U.S. 44 (1996), in which the Supreme Court held: "[W]here Congress has prescribed a detailed remedial scheme for the enforcement against a State of a statutorily created right, a court should hesitate before casting aside those limitations and permitting an action against a state officer based upon Ex parte Young." Id. at 74.

In Seminole Tribe, the Court found that Congress intended to limit the availability of an Ex parte Young suit against state officers for violations of federal statutory law when it enacted the Indian Gaming Regulatory Act (the "IGRA"). See id. at 75-76. However, the statute that gives rise to Plaintiffs' claims in this case is distinguishable from the IGRA. In Seminole Tribe itself, the Court differentiated between the IGRA and statutes

56

such as the Clean Water Act (the "CWA").  See 517 U.S. at 75 n.17

(noting that the IGRA provision at issue "stands in contrast to"

provisions such as those under the CWA, in which Congress is

clear that it intends to authorize federal jurisdiction over

government entities and focusing on the "any person" language in

the CWA citizen suit provision).  We are persuaded that the

similarity of the citizen suit provisions of the CWA and the RCRA

requires like interpretation.  See U.S. Dep't of Energy v. Ohio,

503 U.S. 607, 615-16 (1992).  The CWA authorizes citizen suits

> against any person (including (i) the United States,
> and (ii) any other governmental instrumentality or
> agency to the extent permitted by the eleventh
> amendment to the Constitution) who is alleged to be in
> violation of (A) an effluent standard or limitation
> under this chapter or (B) an order issued by the
> Administrator or a State with respect to such a
> standard or limitation.

33 U.S.C. § 1365(a)(1) (2000).  Similarly, Plaintiffs are suing

pursuant to the RCRA provision that authorizes citizens suits

> against any person (including (a) the United States,
> and (b) any other governmental instrumentality or
> agency, to the extent permitted by the eleventh
> amendment to the Constitution) who is alleged to be in
> violation of any permit, standard, regulation,
> condition, requirement, prohibition, or order.

42 U.S.C. § 6972(a)(1)(A).  That the RCRA authorizes suits

against "any person" "to the extent permitted by the eleventh

amendment" clearly indicates that Congress specifically intended

to permit suits against states within the bounds of the

Amendment.  See, e.g., Prisco v. New York, No. 91 Civ. 3990

(RLC), 1996 WL 596546, at *16 (S.D.N.Y. Oct. 16, 1996)

57

(determining that Seminole Tribe did not bar plaintiff's RCRA claim under Ex parte Young); cf. S. REP. NO. 92-414, at 64 (1971), reprinted in 1972 U.S.C.C.A.N. 3668, 3730 (stating that "if the Federal, State, and local agencies fail to exercise their enforcement responsibility, the public is provided the right to seek vigorous enforcement action under the citizen suit provisions"); Natural Res. Def. Council v. Cal. Dep't of Transp., 96 F.3d 420, 424 (9th Cir. 1996) (finding that "Congress implicitly intended to authorize citizens to bring Ex parte Young suits against state officials with the responsibility to comply with [the CWA]").

We thus find the RCRA, with its explicit reference to the Eleventh Amendment and its similarity to the CWA, to be precisely the sort of statute envisioned by the Seminole Tribe Court to authorize an Ex parte Young action. See 517 U.S. at 75 n.17. Far from demonstrating Congress's intention to bar access to Ex parte Young, the RCRA embraces the Ex parte Young doctrine as a feature of its remedial scheme. Therefore, Plaintiffs' RCRA claim against Saitas is not barred by Seminole Tribe's exception to the doctrine of Ex parte Young.

### C. Plaintiffs' Claims Against Saitas

We now turn to Plaintiffs' claims against Saitas, namely that Saitas was obligated to classify the Deepwood and South Loop 12 sites as open dumps and then to set in motion procedures to upgrade or close those dumps. See supra Part IV.B.1. Plaintiffs

58

assert that Saitas's failure to take these actions places Saitas in violation of 42 U.S.C. §§ 6943(a), 6944, 6945(a) & (b), and the relevant regulations, particularly 40 C.F.R. § 256.23. See id. Plaintiffs seek to enforce these obligations via the citizen suit provision in § 6972(a)(1)(A).

The district court did not err in finding that Plaintiffs have not carried their burden on their claims against Saitas. Plaintiffs failed to demonstrate that Saitas's actions contravened the statutory provisions and regulations that are the basis of their suit. In essence, Plaintiffs seek to add requirements not explicitly dictated by the statute.

As discussed supra in Part IV.A, the RCRA places several conditions[49] on states in order for them to receive federal funding for waste management. See 42 U.S.C. § 6947(b). A state is required to submit a solid waste management plan, which must be approved by the EPA. See id. §§ 6942, 6947. This approval depends upon the plan satisfying the requirements in the RCRA. See id. § 6943.

---

[49] Plaintiffs spend considerable time arguing that these conditions create enforceable obligations under Pennhurst State School & Hospital v. Halderman, 451 U.S. 1, 24 (1981) (stating that a state's knowing and voluntary acceptance of conditions in exchange for federal funding will create substantive rights enforceable against a state). We are not in disagreement with this proposition. As will be explained infra in the text, Plaintiffs' claim fails, not because a state's obligations in the RCRA are unenforceable, but because Plaintiffs have not demonstrated that Saitas has violated any of those obligations.

59

The Texas state plan, which was approved by the EPA, informs the reader that the State "has undertaken a program to classify all land disposal facilities in Texas." It states further: "Since all disposal sites could not be inventoried immediately, a strategy was developed to determine which facilities would be inventoried first. . . . A priority list was then prepared for the first year of the [ODI] and the [ODI] was begun." This meets the requirement in 40 C.F.R. § 256.23(a) that the "State plan shall provide for the classification of existing solid waste disposal facilities." The plan also explains that once the State classifies a site as an open dump, the State will "continue surveillance and enforcement to eliminate [the] existing open dump by closing or upgrading" and includes a "procedure chart for upgrading or closure of open dumps." These features of the plan are in line with § 6943(a)(3)'s requirement that the "plan shall provide for the closing or upgrading of all existing open dumps" and with 40 C.F.R. § 256.23(d)'s statement that the plan must account for "long-term monitoring and contingency plans." Plaintiffs would, in essence, have us read another provision into the RCRA that compels Saitas to act beyond these statutory requirements. We cannot adopt their interpretation of the statute.

We find the statutory requirements satisfied. Saitas submitted a plan that conformed to the requirements in the RCRA. The statutory provisions and relevant regulations obligate a

60

state "to provide for" certain elements in the state plan, which Saitas did. The requirements that a state "shall take [certain] steps" appear in the context of a facility already classified as an open dump. See, e.g., 40 C.F.R. § 256.23(c) & (d). We do not find any "permit, standard, regulation, condition, requirement, prohibition, or order which has become effective pursuant to [the RCRA]," 42 U.S.C. § 6972(a)(1)(A), that a state "shall take steps" to classify waste disposal facilities. Rather, we find in the RCRA that a state "shall provide for" such a classification in its plan, which, as we have explained, Saitas has done. Our conclusion regarding Saitas's duties in placing the Deepwood and South Loop 12 dumps on the ODI is buttressed by the EPA's comments in amending 40 C.F.R. §§ 256 and 257: "[The] EPA is required to publish an inventory of open dumps, based on the State findings. In doing so, [the] EPA does not pass on the adequacy of the State determinations. Likewise the decision to remove a facility from the inventory is a State determination." Guidelines for Development and Implementation of State Solid Waste Management Plans and Criteria for Identification of Solid Waste Disposal Facilities and Practices, 46 Fed. Reg. 47048, 47048 (Sept. 23, 1981).

While Plaintiffs valiantly attempt to read a requirement into the RCRA that Saitas must not only "provide for" the classification of all waste facilities, but also must "take steps" to perform the classification, we do not find that

61

Congress included such a specification in the statute. Therefore, Plaintiffs have not demonstrated that Saitas violated a permit, standard, regulation, condition, requirement, prohibition, or order, and as such, fail to carry their burden on their § 6972(a)(1)(A) claims concerning the Deepwood and South Loop 12 dumps.

## V. CONCLUSION

For the above-stated reasons, we AFFIRM the judgment of the district court. Stay pending appeal VACATED. Plaintiffs and the City shall each bear one-half of the costs of this appeal.